1   Hal Michael Clyde (SBN CA 302473)
    MClyde@perkinscoie.com
2   PERKINS COIE LLP
    3150 Porter Drive
3   Palo Alto, California 94304-1212
    Telephone: 650.838.4300
4   Facsimile:  650.838.4350

5   Donald J. Kula (SBN CA 144342)
    DKula@perkinscoie.com
6   PERKINS COIE LLP
    1888 Century Park East, Suite 1700
7   Los Angeles, California 90067-1721
    Telephone: 310.788.9900
8   Facsimile:  310.788.3399

9   Attorneys for J. R. Simplot Company

10

11                  UNITED STATES DISTRICT COURT

12                  EASTERN DISTRICT OF CALIFORNIA

13

14   CALAMCO, a California corporation;          Case No. 2:21-cv-01201-KJM-KJN

15              Plaintiff,                        **ANSWER AND COUNTERCLAIM OF J. R.
                                                  SIMPLOT COMPANY**
16        v.

17   J. R. Simplot Company and DOES 1 through
     10,
18
                Defendant.
19
     J. R. Simplot Company,
20
                Defendant-Counterclaimant
21
          v.
22
     CALAMCO, a California Corporation,
23
                Plaintiff-Counterclaim
24              Defendant.

25                               **ANSWER**

26        For its answer to the Complaint, J. R. Simplot Company ("Simplot") states:

27        1.      Responding to paragraph 1 of the Complaint, Simplot admits that CALAMCO

28   Simplot are parties to a Handling and Storage Agreement entered into on March 21, 2001, after a

1  long series of negotiations during which CALAMCO agreed that Simplot would be the exclusive

2  supplier of UAN32 through the CALAMCO facilities in exchange for Simplot's agreement to (i)

3  supply a specified minimum quantity of UAN32 through the CALAMCO facilities on a "take or

4  pay" basis, and (ii) supply to CALAMCO members their requirements for UAN32 (the "2001

5  HSA"). A true and authentic copy of the 2001 HSA is attached as **Exhibit 1**. CALAMCO agreed

6  to construct and operate storage facilities for the exclusive use of Simplot in supplying UAN32 to

7  CALAMCO's members. The 2001 HSA was replaced in 2011 (the "2011 HSA"), and it expressly

8  provided:

9      "[i]n March 2001, Calamco and Simplot *partnered together* to
10     address concerns over potential declines in the application of
       ammonia within California agriculture. In order to maintain
11     Calamco's ability to supply its membership with nitrogen fertilizer,
       Simplot and Calamco reached agreement for Simplot to bring off-
12     shore fertilizer UAN 32 solutions ("Product")  to the Western U.S.
       market, *with Calamco providing to Simplot the off-loading and
13     storage facilities, together with handling activities to accommodate
       such Product*.

14  (emphasis added) The 2011 HSA also expressly provided "[t]he Parties wish[ed] for this

15  arrangement to continue," and Simplot's role as the exclusive supplier of UAN32 was unchanged.

16  A true and authentic copy of the 2011 HSA is attached as **Exhibit 2**. Simplot has been the sole

17  and exclusive supplier of UAN32 sold through CALAMCO facilities from the execution of the

18  2001 HSA through the date of this Answer and Counterclaim.

19      2.      Responding to paragraph 2 of the Complaint, Simplot admits that the 2011 HSA

20  was amended on March 12, 2020 (the "Piping Amendment"). An accurate and authentic copy of

21  the Piping Amendment is attached as **Exhibit 3**. The Piping Amendment allowed CALAMCO to

22  use the inbound piping, based on the express representation of Dan Stone, CALAMCO's CEO,

23  that the amendment would have "no impact" on current operations. Stone admitted that "Simplot

24  decided to NOT pursue a modification in the business model with CALAMCO. Simplot agreed to

25  amend the storage & handling contract to allow CALAMCO to use the piping, which saves

26  CALAMCO $0.5M in capital IF CALAMCO decides to construct a UAN tank." There has been

27  no decision by the CALAMCO Board of Directors to develop its "own UAN32 business" or to

28  construct a new UAN tank. Simplot did not agree to any modification of the business model that

1   Simplot and CALAMCO had operated under since 2001, with Simplot as the sole supplier of

2   UAN32 sold through the CALAMCO facilities. Simplot refers to the 2001 HSA, the 2011 HSA,

3   and the Piping Amendment collectively as the "HSA."

4          3.      Responding to paragraph 3 of the Complaint, Simplot admits that an action was

5   commenced on May 20, 2021, in California Superior Court, San Joaquin County, requesting that

6   the Court adjudicate the parties' dispute concerning their rights and obligations under the 2011

7   HSA and the Piping Amendment, but that Complaint made no reference to the 2001 HSA, the

8   negotiations that resulted in the 2001 HSA, or the intent of the parties in entering into the 2001

9   HSA, the 2011 HSA, and the Piping Amendment, all of which are essential to the interpretation

10  of the HSA. That lawsuit was commenced without notice to, or approval by, the CALAMCO

11  Board of Directors, and thus is unauthorized and no party has capacity to pursue those claims on

12  behalf of CALAMCO.

13         4.      Responding to paragraph 4 of the Complaint, Simplot admits that CALAMCO is a

14  California corporation with its principal place of business at 1776 West March Lane, Suite 420,

15  Stockton, CA 95207, and deny that it is a cooperative association under the provisions of Chapter

16  1 of Division 20 of the California Food & Agricultural Code and that it is a nonprofit association

17  as defined in California Food & Agriculture Code section 54033.

18         5.      Responding to paragraph 5 of the Complaint, Simplot admits the averments of

19  paragraph 5.

20         6.      Responding to paragraph 6 of the Complaint, Simplot states that it lacks

21  knowledge or information sufficient to form a belief as to the truth or falsity of the averments of

22  paragraph 6.

23         7.      Responding to paragraph 7 of the Complaint, Simplot admits the averments of

24  paragraph 7.

25         8.      Responding to paragraph 8 of the Complaint, Simplot denies the averments of

26  paragraph 8.

27         9.      Responding to paragraph 9 of the Complaint, Simplot states that CALAMCO was

28  formed in 1957 as a joint venture between the Best Fertilizer Co. ("Best") and a group of

California growers for the principal purpose of manufacturing and selling nitrogen fertilizers and their components to the growers. CALAMCO has two classes of common stock, A and B; both have the same par value and voting rights in CALAMCO's Articles of Incorporation. The Class A shareholders are growers or growers' organizations. The Class B shareholders are manufacturers, processors, or suppliers of nitrogen fertilizers (or their components), i.e., the dealer members who sell products to CALAMCO and to end users.

10.     Responding to paragraph 10 of the Complaint, Simplot states that Best was acquired by Occidental Chemical Company, a subsidiary of Occidental Petroleum Corporation ("Occidental"), which also acquired Best's interest in CALAMCO.

11.     Responding to paragraph 11 of the Complaint, Simplot admits that in December 1982, Simplot acquired Occidental's interest in CALAMCO, which was transferred to Cal Ida Chemical Company, a wholly owned subsidiary of Simplot.

12.     Responding to paragraph 12 of the Complaint, Simplot admits the averments of paragraph 12.

13.     Responding to paragraph 13 of the Complaint, Simplot states that CALAMCO's Board of Directors currently consists of seven directors, four of whom (Case Van Steyn, Alan Freese, Doug Devaney, and Bardin Bengard) have been elected by the Class A shareholders (the "Class A Directors") and three of whom (Richard Sunderland, G. Rey Reinhardt, and Chris Shelden) have been elected by the Class B shareholders (the "Class B Directors"). As of June 8, 2021, there were 1,200,000 Class A shares authorized, with 1,019,748 issued and outstanding, held by 960 Class A shareholders. There were also 1,250,000 Class B shares authorized, with 1,048,636 shares issued and outstanding held by a total of 40 Class B shareholders. However, due to the provisions of CALAMCO's current Bylaws, Class A shareholders elect four of seven directors, regardless of whether the Class A shareholders own a majority of the shares of CALAMCO.

14.     Responding to paragraph 14 of the Complaint, Simplot admits that because it owns a majority of the Class B shares, it has the ability to elect the three Class B Directors, and each of them is a Simplot employee.

15.     Responding to paragraph 15 of the Complaint, Simplot admits that it manufactures and sells fertilizers and other agricultural chemicals, among other operations.

16.     Responding to paragraph 16 of the Complaint, Simplot admits the averments of paragraph 16.

17.     Responding to paragraph 17 of the Complaint, Simplot admits that CALAMCO and Simplot are parties to the 2001 HSA, after extended negotiations during which CALAMCO agreed that Simplot would be the exclusive source of supply of UAN32 sold through the CALAMCO facilities in exchange for Simplot's agreement to (i) supply through the CALAMCO facilities 100,000 short tons of UAN32 on a take or pay basis, and (ii) supply to CALAMCO members their requirements for UAN32. The 2001 HSA was superseded in 2011 with the 2011 HSA. Simplot refers to paragraphs 53 through 74 below for further allegations regarding the 2001 HSA. The 2011 HSA had the same material terms as the 2001 HSA. The 2011 HSA specified that "[t]he Parties wish for this arrangement [set forth in the 2001 HSA] to continue," and Simplot's role as the exclusive supplier of UAN32 was unchanged by the 2011 HSA.

18.     Responding to paragraph 18 of the Complaint, Simplot admits the averments of paragraph 18.

19.     Responding to paragraph 19 of the Complaint, Simplot denies the averments of paragraph 19 and refers to paragraphs 73 through 87, below, and the full text of the 2011 HSA for its terms.

20.     Responding to paragraph 20 of the Complaint, Simplot admits that CALAMCO has never been engaged in the manufacture, distribution or sale of UAN32 and that Simplot has been the sole and exclusive supplier of UAN32 sold through the CALAMCO facilities from the execution of the 2001 HSA through the date of this Answer and Counterclaim.

21.     Responding to paragraph 21 of the Complaint, Simplot admits that the CALAMCO Board of Directors approved a potential acquisition of an Agrium facility in West Sacramento. The CALAMCO Board of Directors expressly recognized that purchase, if completed, would affect the relationship between CALAMCO and Simplot and this would need to be addressed.

22.     Responding to paragraph 22 of the Complaint, Simplot admits the averments of paragraph 22.

23.     Responding to paragraph 23 of the Complaint, Simplot denies the averments of paragraph 23.

24.     Responding to paragraph 24 of the Complaint, Simplot denies the averments of paragraph 24.

25.     Responding to paragraph 25 of the Complaint, Simplot denies the averments of paragraph 25.

26.     Responding to paragraph 26 of the Complaint, Simplot admits that Stone led a discussion on the status of his proposed UAN32 Project, and the topics discussed included permitting, discussions with vendors for the potential tank, a lease proposal from the Port of Stockton, the estimated cost of the project, seeking potential partnerships with existing UAN32 vendors at the Port of Stockton, and discussions of a potential partnership with Simplot.

27.     Responding to paragraph 27 of the Complaint, Simplot admits that CALAMCO and Simplot executed the Piping Amendment on March 12, 2020, and refers to paragraphs 88 through 91 below, and the Piping Amendment for its terms. Also on March 12, 2020, Stone informed the CALAMCO Board of Directors that "[o]n UAN, Simplot had decided to NOT pursue a modification in the business model with CALAMCO," and instead the current business model of Simplot as the exclusive supplier of UAN32 passing through the CALAMCO's facilities would remain in place.

28.     Responding to paragraph 28 of the Complaint, Simplot admits that Stone's proposed UAN32 Project was discussed in the June 16, 2020 Board meeting. The directors discussed that Simplot was not willing to amend or abandon the exclusive supply right negotiated for and agreed to in the HSA, and G. Rey Reinhardt reminded Stone and all directors that "a deal is a deal." Although not referred to in the Complaint, on July 16, 2020, Stone organized a "Special Competitive Meeting" of only the four Class A directors. There was no proper notice of the meeting or a quorum, as required by the CALAMCO Bylaws, and no notice at all of the meeting was provided to the Class B Directors. Under Stone's guidance, the Class A directors

purported to adopt a resolution to "proceed with CALAMCO's UN32 project" in the July 16 meeting. When the Class B Directors learned of the meeting, counsel for the Class B directors promptly notified CALAMCO that the purported action was ineffective under the Bylaws.  No action of the CALAMCO Board of Directors has subsequently authorized the "UN32 project."

29.     Responding to paragraph 29 of the Complaint, Simplot denies the averments of paragraph 29.

30.     Responding to paragraph 30 of the Complaint, Simplot denies the averments of paragraph 30.

31.     Responding to paragraph 31 of the Complaint, Simplot denies the averments of paragraph 31.

32.     Responding to paragraph 32 of the Complaint, Simplot incorporates by this reference its responses to paragraphs 1-32 of the Complaint.

33.     Responding to paragraph 33 of the Complaint, Simplot admits the averments of paragraph 33.

34.     Responding to paragraph 34 of the Complaint, Simplot admits that the paragraph seeks the relief stated.

35.     All averments of the Complaint not expressly admitted above are denied.

### DEFENSES AND COUNTERCLAIM

For its Defenses to the Complaint, and its Counterclaim against CALAMCO, Simplot incorporates by this reference all paragraphs of this Answer and Counterclaim, and states as follows:

36.     Simplot acquired its interest in CALAMCO in 1982, and CALAMCO and Simplot have entered into a number of written agreements for their mutual benefit and for the benefit of all CALAMCO shareholders.

37.     The relationship between CALAMCO and Simplot has been one of trust and confidence for both parties' mutual benefit, constituting a long-term, joint venture partnership, as confirmed in the 2011 HSA, in which CALAMCO agreed that "Calamco and Simplot *partnered*

1   *together*" to bring UAN32 to CALAMCO's members "with Calamco providing to Simplot the

2   off-loading and storage facilities, together with handling activities to accommodate" "*Simplot* to

3   bring off-shore fertilizer UAN 32 solutions ("Product") to the Western U.S. market."

4          38.     In reliance on the mutual duties flowing from that partnership, and as part, and to

5   further the interests, of that partnership, Simplot has shared extensive confidential information

6   with CALAMCO, and with CALAMCO's management and members of CALAMCO's Board of

7   Directors in particular, including regular updates on Simplot's operations.

8          39.     The confidential information Simplot shared with CALAMCO includes

9   information concerning the markets for, the acquisition and distribution of, and Simplot's

10  experience and expertise regarding, nitrogen-based fertilizers, including UAN32.

11         40.     The confidential information Simplot shared with CALAMCO includes

12  information regarding Simplot's development of a market for UAN32, Simplot's acquisition of

13  UAN32 to supply to CALAMCO's members, and projections regarding Simplot's expected sales

14  of UAN32 through the CALAMCO facilities.

15         41.     In its partnership role in operating its facilities for the distribution of Simplot

16  UAN32 to CALAMCO's members, CALAMCO has gained additional, detailed, confidential

17  information on Simplot's development of a market for UAN32, Simplot's acquisition of UAN32

18  to supply to CALAMCO's members, and the sale and distribution of UAN32 to CALAMCO's

19  shareholders.

20         42.     CALAMCO has a duty to maintain the confidential information so acquired for the

21  mutual benefit of the CALAMCO/Simplot joint venture partnership, and not to use that

22  information to take business opportunities from Simplot or otherwise to use the confidential

23  information to serve CALAMCO's individual interests, including the interests of only some of

24  CALAMCO's shareholders, and to the detriment of Simplot's interests

25         43.     The nature of the CALAMCO cooperative, its charter, bylaws, and even public

26  statements, along with the parties' course of dealings for decades and interconnected specific

27  agreements, have created a joint venture partnership between CALAMCO and Simplot in which

28  they are obligated to, and have until recently, acted to the mutual benefit of both parties. But

CALAMCO's management has, at least for the last two years, conspired to take actions that serve only the interests of certain CALAMCO shareholders, and intentionally and knowingly hurt the interests of other minority shareholders and its industry partner, Simplot.

44.     CALAMCO's interest in UAN32 did not begin with the 2011 HSA. There is a 15 year history predating that Amendment, and that history confirms it was always the mutual intent of CALAMCO and Simplot that the HSA was an exclusive supply agreement, pursuant to which Simplot would be the sole supplier of UAN32 to CALAMCO members that passed through CALAMCO's facilities.

45.     CALAMCO's Complaint ignores the 35-plus year history of the joint venture partnership between CALAMCO and Simplot, including CALAMCO's failure to enter the "UAN32 market" before CALAMCO asked Simplot to assume the role of supplying its members with UAN32.

46.     Beginning in 2001, Simplot assumed all the risk in developing a reliable market to supply UAN32 to CALAMCO members.

47.     Since 2001, Simplot has, through foresight, diligence, industry, and careful risk management, created the market for UAN32 that CALAMCO now wishes to usurp, breaching its contract with, and its fiduciary duties to, Simplot, CALAMCO's admitted "industry partner" and joint venturer.

I.      **CALAMCO TRIED, AND FAILED, AT SELLING UAN32.**

48.     CALAMCO attempted to enter the UAN32 market between 1996 and 1999, but it failed.

49.     When CALAMCO was unable to obtain the necessary supply of UAN32, CALAMCO asked Simplot if it would agree to provide "full coverage" of the CALAMCO members' needs for UAN32.

50.     Simplot was reluctant to assume that commitment, because there was no developed market for UAN32 in California, and CALAMCO had been unable to find a reliable source of UAN32.

51.     After extended negotiations, Simplot and CALAMCO agreed that Simplot would

be the exclusive supplier of UAN32 to CALAMCO members for all of their UAN32 requirements in exchange for Simplot's agreement that it would supply at least 100,000 short tons of UAN32 each year to the CALAMCO facility.

52.     As part of the negotiations, Simplot and CALAMCO agreed that their agreement would be on a "take or pay" basis for the first 100,000 short tons of UAN32. Simplot would provide that minimum annual commitment of UAN32 to be put through the facilities that CALAMCO would build, and if Simplot could not provide that annual minimum commitment, Simplot would pay CALAMCO for the shortfall.

## II.     THE HANDLING AND STORAGE AGREEMENT.

### A.     The 2001 HSA.

53.     On March 21, 2001, Simplot and CALAMCO entered into the 2001 HSA, a true and authentic copy of which is attached as **Exhibit 1**.

54.     Under the terms of the 2001 HSA:

> (1) Calamco will construct, maintain and operate such Facilities as are capable of receiving and storing Forty Thousand (40,000) short tons of liquid Product; (2) Simplot, subject to the provisions herein, shall take from the Facilities each contract year, not less than One Hundred Thousand (100,000) short tons of Product (with appropriate adjustment for the first contract year as set forth herein); and (3) so long as Simplot is in compliance with the provisions of this Agreement and covers all of Calamco shareholders' identified volume each year, *Calamco will operate the Facilities for the exclusive use of Simplot.*

[Exh. 1 at 1, Recitals (emphasis added)]

55.     The UAN32 provided by CALAMCO "shall not be commingled with similar materials belonging to any other party whatsoever, unless otherwise mutually agreed by both parties or provided herein." [Exh. 1 at 1, para. 1.a]

56.     CALAMCO warranted in the 2001 HSA that, "services it provides or may provide to third-party businesses will not adversely impact its ability to perform its obligations to Simplot hereunder." [Exh. 1 at 3, para. 4]

57.     The 2001 HSA also provides Simplot with a right of first refusal:

1

2

3

> In the event Calamco offers to sell or accepts an offer to sell any of its UAN handling facilities, including tanks, piping, and associated right-of-way, at the Port of Stockton, it shall first extend that offer to sell or that acceptance to Simplot for Simplot's consideration or for Simplot to match the acceptance terms and conditions.

4   [Exh. 1 at 6, para. 16]

5         58.    The 2001 HSA is governed by California law, and:

6

7

> In the event of litigation arising out of this Agreement, the party prevailing in such litigation shall be entitled, in addition to such other relief as may be granted, to recover its attorney's fees and costs from the losing party.

8   [Exh. 1 at 6, paras 16 and 18]

9

10         59.    Simplot would not have entered into the 2001 HSA, which requires that Simplot

11   "cause to be put through the Facilities not less than One Hundred Thousand (100,000) short tons

12   of Product each contract year during the initial Term and any extension of this Agreement," if

13   Simplot had not been guaranteed that it would be the exclusive supplier of UAN32 to

14   CALAMCO members through the CALAMCO facilities. [Exh. 1 at 3, para. 4] Otherwise,

15   CALAMCO would be able to interfere with Simplot's ability to meet its annual minimum

16   commitment by, among other actions, selling UAN32 directly to members through CALAMCO's

17   facilities in competition with Simplot.

18         60.    Since March 21, 2001, Simplot has been the exclusive supplier of UAN32 to

19   CALAMCO members supplied through CALAMCO's facilities.

20         61.    CALAMCO has described its UAN32 Handling and Storage Agreements with

21   Simplot as a "joint venture" and as a "partnership" in private and public statements.

22         62.    Following the execution of the 2001 HSA, CALAMCO announced to its members:

23

24

> In March of 2001, the Board of Directors approved a *joint-venture* agreement proposed by CALAMCO management and Simplot whereby CALAMCO would build and operate a 40,0000-ton capacity UAN32 storage facility, while *Simplot would procure and market the product.*

25

26

27

> Contract terms include a ten-year fixed commitment by Simplot to terminal product through the new facility with six consecutive five-year options. This would bring the contract through the year 2040.

28

**B.     Simplot Could Not Supply 100,000 Short Tons of UAN32 in 2004, 2006, 2008, and 2009, and It Had to Pay CALAMCO for the Shortfalls.**

63.     When Simplot entered into the 2001 HSA, there was no developed market for UAN32 in California. That was one of the reasons that CALAMCO had been unable to provide UAN32 to its members.

64.     In 2002 (the first full year operating under the HSA, Simplot supplied 176,821 short tons of UAN32 to CALAMCO members through the CALAMCO facilities.

65.     In 2003, Simplot supplied 149,183 short tons of UAN32 to CALAMCO members through the CALAMCO facilities.

66.     In 2004, Simplot was unable to acquire 100,000 short tons of UAN32 to supply to CALAMCO's members through the CALAMCO facilities.

67.     CALAMCO did not purchase (or otherwise acquire) UAN32 to cover its members' needs.

68.     CALAMCO demanded that Simplot pay for the shortfall, and Simplot paid CALAMCO $70,249.59 for the 6,774.31 short tons shortfall.

69.     In 2006, 2008, and 2009, Simplot was also unable to acquire 100,000 short tons of UAN32 to supply to CALMACO's members through the CALAMCO facilities.

70.     In each of those years, CALAMCO did not purchase (or otherwise acquire) UAN32 to cover its members' needs, but again it demanded that CALAMCO pay it for the shortfalls.

71.     In 2006, Simplot paid CALAMCO $177,981.09 for the shortfall of 16,019.90 short tons. In 2008, Simplot paid CALAMCO $165,430.18 for the shortfall of 14,103.70 short tons. In 2008, Simplot paid CALAMCO $151,553.45 for the shortfall of 12,504.41 short tons.

72.     In all other years, Simplot has met the requirements of the CALAMCO members and has also provided the minimum amount of UAN32 required under the terms of both the 2001 HSA and the 2011 HSA.

**C.     The 2011 HSA.**

73.     The 2001 HSA was superseded in 2011 with a new Handling and Storage

1    Agreement entered into on June 16, 2011 (the "2011 HSA"). A true and authentic copy of the

2    2011 HSA is attached as **Exhibit 2**.

3         74.    The 2011 HSA had the same material terms as the 2001 HSA.

4         75.    In the 2011 HSA Simplot and CALAMCO agreed that, "[i]n March 2001,

5    *Calamco and Simplot partnered together* to address concerns over potential declines in the

6    application of ammonia within California agriculture. In order to maintain Calamco's ability to

7    supply its membership with nitrogen fertilizer, *Simplot and Calamco reached agreement for*

8    *Simplot to bring off-shore fertilizer UAN 32* solutions ("Product") to the Western U.S. market,

9    *with Calamco providing to Simplot* the off-loading and storage facilities, together with handling

10   activities to accommodate such Product." [Exh. 2 at 1, Recitals A] (emphasis added)]

11        76.    The 2011 HSA specified that "[t]he  Parties wish for this arrangement [set forth in

12   the 2001 HSA] to continue, and Simplot now desires to increase the volume of imports of Product

13   and Calamco desires to expand its storage facilities with additional tankage ("New Tank") to

14   support this growth." [Exh. 2 at 1, Recitals A]]

15        77.    Simplot's role as the exclusive supplier of UAN32 to CALAMCO members

16   through the CALAMCO facilities was unchanged by the 2011 HSA.

17        78.    Under the terms of the 2011 HSA:

18           (1) Calamco will construct the New Tank of Thirty Thousand
             (30,000) short tons, and maintain and operate such Facilities as are
19           capable of receiving and storing Seventy Thousand (70,000) short
             tons of liquid Product; (2) Simplot, subject to the provisions herein,
20           shall take from the Facilities each contract year, not less than One
             Hundred Thousand (100,000) short tons of Product (the "Minimum
21           Commitment"); and (3) so long as Simplot is in compliance with
             the provisions of this Agreement and uses reasonable good faith
22           efforts to meet the Product volume requirement of Calamco
             shareholders, *Calamco will operate the Facilities for the exclusive*
23           *use of Simplot*.

24   [Exh. 2 at 1, Recitals C) (emphasis added)]

25        79.    The requirements provision in the 2011 HSA was considered so key by the parties,

26   they specifically provided that:

27           For purposes of this Agreement, "meeting the Product volume
             requirements of Calamco shareholders" means fulfilling market
28

orders placed by identified Calamco shareholders at Simplot's then applicable prices, contract/ordering requirements, delivery schedules and Terms and Conditions of Sale.

[Exh. 2 at 1, Recitals C]]

80.     The 2011 HSA also provided that:

in the event Calamco expresses an interest to use a portion of the Facilities (e.g. the load-out equipment) for distribution of a different product from a new tank that might be constructed in the future, Calamco must first obtain the consent of Simplot , which will not be unreasonably withheld *so long as such use does not have the effect of: i) restricting Simplot's import/intake or distribution of Product; ii) interfering with Calamco's ability to provided services under this Agreement; or iii) creating a material detriment to Simplot.*

[Exh. 2 at 1-2, Recitals C] (emphasis added)]

81.     The UAN32 provided by CALAMCO "shall not be commingled with similar materials belonging to any other party whatsoever, unless otherwise mutually agreed by both parties or provided herein." [Exh. 2 at 2, para. 1.a]

82.     CALAMCO warranted in the 2011 HSA that, "services it provides or may provide to third-party businesses will not adversely impact its ability to perform its obligations to Simplot hereunder." [Exh. 2 at 3, para. 4]

83.     The 2011 HSA also provides Simplot with a right of first refusal, but with a new added sentence that "Calamco may not sell or lease any of the Facilities without the consent of Simplot." [Exh. 2 at 8, para. 16]

84.     The Right of First Refusal further provides:

In the event Simplot consents, and Calamco offers to sell or accepts an offer to sell any of the Facilities, including tanks, piping, and associated right-of-way, at the Port of Stockton, it shall first extend that offer to sell or that acceptance to Simplot for Simplot's consideration or for Simplot to match the acceptance terms and conditions.

[Exh. 2 at 8, para. 16]

85.     The 2011 HSA is governed by California law, and:

In the event of litigation arising out of this Agreement, the party prevailing in such litigation shall be entitled, in addition to such other relief as may be granted, to recover its attorney's fees and

1                   costs, including but not limited to the fees and costs of expert
       witnesses from the losing party.

2    [Exh. 2 at 8, paras 18 and 20]

3           86.     Simplot would not have entered into the 2011 HSA, which requires that "Simplot

4    shall cause to be put through the Facilities not less than the Minimum Commitment described in

5    C) above," if Simplot had not been guaranteed that it would be the exclusive supplier of all of the

6    UAN32 product volume requirements of CALAMCO's members through the CALAMCO

7    facilities. [Exh. 2 at 3, para. 4] Otherwise, CALAMCO would be able to interfere with Simplot's

8    ability to meet its annual minimum commitment by, among other actions, selling UAN32 directly

9    to members through CALAMCO's facilities in competition with Simplot.

10          87.     Following the execution of the 2011 HSA, Calamco continued publicly to refer to

11   Simplot as its "partner."

12         **D.**      **The March 2020 Piping Amendment to the 2011 HSA.**

13          88.     On March 2, 2020, Stone told Sunderland he wanted Simplot to "waive the

14   contractual clause reserving all the UAN equipment for Simplot's exclusive use."

15          89.     When Stone confirmed his proposal only involved the use of the piping and would

16   have "no impact" on "operations compared to today," Simplot agreed to the amendment to the

17   2011 HSA that Stone proposed. The Piping Amendment was executed on March 12, 2020, and an

18   accurate and authentic copy of the Piping Amendment is attached as **Exhibit 3**.

19          90.     The Piping Amendment did not alter Simplot's exclusive supply rights, or its

20   Minimum Commitment, in the 2011 HSA.

21          91.     Stone confirmed the Piping Amendment did not alter the current supply agreement

22   in an email to the entire Board of Directors:

23                       On UAN, Simplot decided to NOT pursue a modification in the

24                       business model with CALAMCO. Simplot agreed to amend the
                           storage & handling contract to allow CALAMCO to use the piping,

25                       which saves CALAMCO $0.5M in capital IF CALAMCO decides
                           to construct a UAN tank.

26   03/12/2020 D. Stone email to the CALAMCO Board Members, an accurate and authentic copy of

27   which is attached as **Exhibit 4** (all capitalization in original).

28

92.     Notwithstanding the unilateral, unauthorized actions taken by the Class A directors at Stone's direction on July 16, 2020, Stone's proposed UAN32 project has not been voted on or otherwise approved by CALAMCO's Board of Directors, and the parties' original business model as described in the HSA remains in place.

## III.   STONE HAS PROPOSED A UAN32 PROJECT THAT, IF ADOPTED, WOULD BREACH THE EXCLUSIVITY OF THE HSA.

93.     Although Simplot has been the exclusive supplier of UAN32 to CALAMCO members through the CALAMCO facilities for more than 20 years, beginning no later than the fall of 2019, Stone secretly enlisted the Class A directors to join him in breaching that exclusive agreement and having CALAMCO acquire and sell UAN32 to its members in competition with Simplot.

94.     Stone communicated with Class A Directors (but not Class B Directors) about his intention to have CALAMCO construct a new UAN tank and begin to sell UAN32, and also about how they might exclude the Class B Directors from those discussions.

95.     Stone has caused CALAMCO to incur expenses in excess of $100,000 in his efforts to have CALAMCO adopt his proposed UAN32 Project, to withhold material information from the Class B Directors regarding his proposal, and to prevent a full and fair discussion of the merits of his proposed UAN32 Project by the entire CALAMCO Board of Directors.

96.     Stone has not provided a full accounting of the costs incurred by CALAMCO in those efforts.

97.     The Class B Directors requested information regarding Stone's proposed UAN32 Project, but they were denied material information relevant to the UAN32 Project, and in October 2020, the Class B Directors sought a writ of mandate in the California Superior Court, San Joaquin County, requiring Stone to provide them with the requested information pursuant to Cal. Corp. Code §§ 1600 et seq. and the CALAMCO bylaws.

98.     On March 5, 2021, the Court (Hon. Barbara A. Kronlund) granted the petition for the writ, which issued on March 15, 2021, requiring Stone to produce all of the information requested by the Class B Directors. Accurate and authentic copies of Judge Kronlund's decision

1    granting the writ and the writ itself are attached as **Exhibits 5 and 6**.

2        99.    Stone commenced production of information pursuant to the writ, and the Class B

3    Directors are attempting to determine the completeness of Stone's production.

4        100.    At no time has the Board of Directors approved the proposed UAN32 Project, and

5    attempts by the Class B Directors to add discussion of the UAN32 Project to the Board's agenda

6    have been rejected.

7    **IV.    CALAMCO'S LAWSUIT AGAINST SIMPLOT.**

8        101.    Counsel for Simplot has discussed with counsel for CALAMCO and Stone the

9    possibility that CALAMCO's acquisition and sale of UAN32 through the CALAMCO facilities

10   would breach the HSA. But Simplot has taken no action to enforce its exclusive supply rights

11   under the HSA.

12       102.    On May 20, 2021, without notice to or approval of the CALAMCO Board of

13   Directors—and without notice to or discussions with Simplot—Stone caused an action to be filed

14   against Simplot in California Superior Court, San Joaquin County, Case No. STK CV UOCT

15   2021 0004690 (the "Declaratory Judgment Action").

16       103.    CALAMCO, however, failed to serve Simplot until June 11, 2021, during which

17   period the Class B Directors continued to try, in good faith, to address the merits of Stone's

18   proposed UAN32 Project.

19       104.    When CALAMCO attempted service on June 11, that service was defective.

20       105.    On June 23, 2021, CALAMCO again attempted service.

21       106.    On July 8, 2021, Simplot removed the Declaratory Judgment Action to this Court.

22       107.    CALAMCO, at the direction of Stone, and with the agreement and complicity of

23   the Class A Directors, has been guilty of oppression, fraud, or malice in its conduct directed

24   toward Simplot.

25                                    DEFENSES

26

27                   FIRST DEFENSE—FAILURE TO STATE A CLAIM

28       108.    Simplot incorporates by this reference the other paragraphs of this Answer and

Counterclaim.

109.    CALAMCO's complaint, either in whole or in part, fails to state a claim upon which relief may be granted.

### SECOND DEFENSE—NON-JUSTICIABLE

110.    Simplot incorporates by this reference the other paragraphs of this Answer and Counterclaim.

111.    CALAMCO's Complaint, does not state a claim that is justiciable, but asks the Court to render an advisory opinion on a dispute that is not ripe.

### THIRD DEFENSE—LACK OF CAPACITY

112.    Simplot incorporates by this reference the other paragraphs of this Answer and Counterclaim.

113.    CALAMCO's Complaint was not authorized by its Board of Directors and the plaintiff lacks capacity to assert the claims stated therein.

### FOURTH DEFENSE—WAIVER

114.    Simplot incorporates by this reference the other paragraphs of this Answer and Counterclaim.

115.    CALAMCO's Complaint, and the claims asserted, are barred, in whole or in part, by the doctrines of waiver, estoppel, unclean hands, and/or acquiescence.

### FIFTH DEFENSE—RATIFICATION

116.    Simplot incorporates by this reference the other paragraphs of this Answer and Counterclaim.

117.    CALAMCO's Complaint, and the claims asserted, are barred, in whole or in part, by the doctrine of ratification.

118.    Simplot reserves the right to assert additional defenses as may become available or apparent during pre-trial proceedings, and otherwise to amend or withdraw defenses based on information learned during pre-trial proceedings.

1

**COUNTERCLAIM**

2

For its counterclaim against CALAMCO, Simplot states:

3

**FIRST CAUSE OF ACTION—DECLARATORY JUDGMENT**

4

     119.    Simplot incorporates by this reference the other paragraphs of this Answer and

5

Counterclaim.

6

     120.    An actual dispute and controversy has arisen and presently exists between Simplot

7

and CALAMCO. That dispute is (i) whether CALAMCO can, under the terms of the HSA,

8

acquire and sell to its members UAN32 through the CALAMCO facilities while the HSA remains

9

in force; (ii) whether CALAMCO and Simplot have a joint venture partnership that imposes

10

duties on the partners to act in the mutual benefit of both parties and not to take actions that injure

11

the interests of Simplot and benefit only CALAMCO and certain CALAMCO shareholders; and

12

(iii) whether Stone, purporting to act on behalf of CALAMCO, has pursued actions to construct a

13

new UAN tank and begin to sell UAN32 in competition with Simplot for the benefit of certain

14

CALAMCO shareholders and knowingly and intentionally harming the interests of other minority

15

shareholders and its industry partner, Simplot..

16

     121.    Simplot requests this Court make a judicial declaration of the parties' respective

17

rights, duties and obligations under the HSA to avoid unnecessary cost and conflict among the

18

parties. In particular, Simplot requests a Court decree (i) that the HSA precludes CALAMCO

19

from acquiring, selling, distributing, or marketing UAN32 to its members through the

20

CALAMCO facilities; (ii) that CALAMCO and Simplot are joint venture partners with duties to

21

act to the mutual benefit of both parties, and that CALAMCO cannot take actions that injure the

22

interests, or usurp corporate opportunities, of Simplot and benefit only CALAMCO and certain

23

CALAMCO shareholders; and (iii) that Stone, purporting to act on behalf of CALAMCO, has

24

pursued actions to construct a new UAN tank and begin to sell UAN32 in competition with

25

Simplot for the benefit of certain CALAMCO shareholders and knowingly and intentionally

26

harming the interests of other minority shareholders and its industry partner, Simplot.

27

28

### SECOND CAUSE OF ACTION— BREACH OF FIDUCIARY DUTIES

122.     Simplot incorporates by this reference the other paragraphs of this Answer and Counterclaim.

123.     As Simplot's partner and co-joint venturer, CALAMCO owed Simplot duties of loyalty, candor, and care.

124.     The conduct alleged above, conceived, implemented, and directed by Stone, violated at least CALAMCO's duties of loyalty and candor to Simplot.

125.     As a result of CALAMCO's breaches of its duties to Simplot, Simplot has incurred damages in an amount to be proven at trial.

### THIRD CAUSE OF ACTION— BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

126.     Simplot incorporates by this reference the other paragraphs of this Answer and Counterclaim.

127.     As Simplot's partner and co-joint venturer, CALAMCO owed Simplot a duty of good faith and fair dealing in the pursuit of their partnership and in the performance of the HSA.

128.     The conduct alleged above, conceived, implemented, and directed by Stone, violated CALAMCO's duty of good faith and fair dealing to Simplot.

129.     As a result of CALAMCO's breaches of its duties to Simplot, Simplot has incurred damages in an amount to be proven at trial.

### RELIEF REQUESTED

Simplot requests judgment as follows:

1.     A declaration that:

    a.     CALAMCO is precluded by the terms of the HSA from acquiring, selling, distributing, or marketing UAN32 to its members through the CALAMCO facilities;

    b.     CALAMCO and Simplot are joint venture partners with duties to act to the mutual benefit of both parties, and that CALAMCO cannot take actions that injure the interests, or usurp corporate opportunities, of Simplot and benefit

1        only CALAMCO and certain CALAMCO shareholders; and

2        c.      Stone, purporting to act on behalf of CALAMCO, has pursued actions to

3                construct a new UAN tank and begin to sell UAN32 in competition with

4                Simplot for the benefit of certain CALAMCO shareholders and knowingly and

5                intentionally harming the interests of other minority shareholders and its

6                industry partner, Simplot.

7    2.      Awarding Simplot judgment on the Second and Third Causes of Action, including

8    general, special, actual and statutory damages.

9    3.      Awarding Simplot judgment on the Second and Third Causes of Action for

10   exemplary and punitive damages.

11   4.      Awarding Simplot attorneys' fees and costs pursuant to the HSA and as otherwise

12   authorized by law.

13   5.      Awarding Simplot such other and additional relief as the Court deems appropriate.

14   July 23, 2021                              **PERKINS COIE LLP**

15

16

17                                         By:/s/*Hal Michael Clyde*
                                              Hal Michael Clyde (SBN CA 302473)
18                                            Donald J. Kula (SBN CA 144342)

19

20

21

22

23

24

25

26

27

28

1

## <u>CERTIFICATE OF SERVICE</u>

2

      I hereby certify that, on this 23rd day of July, 2021, the foregoing document was served

3

upon all counsel of record through this Court's electronic filing system as identified in the Notice

4

of Electronic Filing.

5

6

                            By:/s/*Hal Michael Clyde*
                             Hal Michael Clyde

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

# HANDLING and STORAGE AGREEMENT

THIS AGREEMENT is entered into by and between CALIFORNIA AMMONIA CO., a California corporation ("Calamco") and J.R. SIMPLOT COMPANY, a Nevada corporation ( "Simplot").

## RECITALS

A) Simplot desires to bring off-shore fertilizer solutions ("Product") to the Western U.S. market. Calamco desires to provide to Simplot the off-loading and storage facilities ("Facilities"), together with handling activities to accommodate such Product.

B) Calamco agrees, at its sole cost, to locate at or adjacent to its existing facilities at the Port of Stockton the additional Facilities necessary to accomplish this mutual goal, and will use reasonable efforts to have the Facilities ready to receive and load-out Product by September 1, 2001. Simplot will have the right to review design and construction plans for these Facilities.

C) Calamco and Simplot enter this Handling and Storage Agreement ("Agreement") to set forth the terms and conditions under which both parties will work together to accomplish their interdependent mutual goals. Integral to this Agreement are the obligations that (1) Calamco will construct, maintain and operate such Facilities as are capable of receiving and storing Forty Thousand (40,000) short tons of liquid Product; (2) Simplot, subject to the provisions herein, shall take from the Facilities each contract year, not less than One Hundred Thousand (100,000) short tons of Product (with appropriate adjustment for the first contract year as set forth herein); and (3) so long as Simplot is in compliance with the provisions of this Agreement and covers all of Calamco shareholders' identified volume each year, Calamco will operate the Facilities for the exclusive use of Simplot.

1) DELIVERY and HANDLING   Simplot shall cause Product to be delivered to Calamco's Port of Stockton receiving terminal. Such deliveries shall be coordinated with Calamco to reduce or eliminate delays and demurrages that might otherwise occur.
   a) Product shall not be commingled with similar materials belonging to any other party whatsoever, unless otherwise mutually agreed by both parties or provided herein.
   b) Calamco shall accept delivery of Product at vessel's discharge flange at receiving load arm to its dockside receiving terminal at the Port of Stockton, California.
   c) Calamco shall do and perform all things necessary in Calamco's reasonable opinion for the efficient off-loading, storage, handling and reloading of the Product including, but not limited to:

      i) Furnishing the personnel and equipment required to perform the obligations under this Agreement.

      ii) Taking reasonable precautions to protect the quality of the Product from common and harmful contaminants that are associated with storage and handling of Product, as well as from theft and the elements of nature.   Quantity received will be determined by an independent surveyor at Calamco's expense.

      iii) Unloading, transferring and receiving Product from vessels into the Facilities at a rate of 600 short tons per hour.  Any compensation for dispatch time will be shared equally by Calamco and Simplot.

      iv) Loading Product from the Facilities into trucks and railcars provided or arranged by Simplot.

      v) Weighing all outbound transport on certified scales.

      vi) Performing appropriate receipts, releases, and the like in Simplot's information system, as separately addressed and agreed to.

d) Calamco shall provide for Simplot all necessary related transactions and other services as agreed to from time to time by the parties, including the issuance of receipts upon delivery of Product to the Facilities, receipt of Simplot's orders, the handling of warehouse release forms, truck scale tickets, inventory reports and general correspondence.

      i) Calamco shall invoice Simplot monthly for the services furnished hereunder at the rates set forth herein, and shall, at the time of such invoicing, provide Simplot with a statement setting forth the tonnage received and shipped during each invoiced period.

      ii) Calamco shall furnish Simplot an Inventory Activity Report for each calendar month by the 5th business day of the following calendar month.   This report should include opening inventory balances, addition of each receipt and subtraction of each shipment during the month along with their corresponding Simplot release numbers, and the resulting closing inventory balances.

e) For so long as Simplot covers all of Calamco's shareholders' identified volume of Product,

Simplot shall be entitled to the exclusive use of the Facilities.  However, in the event Simplot fails to cover Calamco's shareholders' volume at any time, other than by an event as described in Section 13, then from that time forward Simplot's exclusivity shall run solely to that portion of the said shareholders' volume actually covered by Simplot.

2) EXPERTISE  Calamco represents and warrants to Simplot that it has the expertise and the personnel to fulfill its obligations under this Agreement and, in particular, to comply with good industry practices and all environmental laws, rules and regulations applicable to this Agreement.

3) <u>DEMURRAGE LIABILIITY</u>  Calamco agrees to use reasonable commercial efforts to arrange immediate dock space at the Port of Stockton for the unloading of the vessels procured by Simplot, but any demurrage relating to such vessel shall be for the account of Simplot.  In the event of a timing conflict between a Calamco-arranged vessel and a Simplot-arranged vessel, the parties will work together to reasonably resolve the needs of both.

Calamco and Simplot specifically agree that the unloading of vessels shall be performed as soon as possible after the vessel has arrived, twenty-four (24) hours a day, seven (7) days a week, during both shipping and non-shipping seasons.

4) <u>QUANTITY</u>  Simplot shall cause to be put through the Facilities not less than One Hundred Thousand (100,000) short tons of Product each contract year during the initial Term and any extension of this Agreement.  In the event the Facilities are completed prior to November 1, 2001, the first contract year shall run from the completion date through October 31, 2002, and the volume for said first contract year shall likewise be not less than One Hundred Thousand (100,000) short tons. Simplot will provide quarterly and annual activity forecasts for Calamco's planning needs.  Calamco explicitly acknowledges the possible overlapping seasonality of receiving and shipping for itself and for Simplot, and warrants it has the ability to handle throughput equal to Simplot's ability to deliver and to remove Product.  Further, Calamco warrants that services it provides or may provide to third-party businesses will not adversely impact its ability to perform its obligations to Simplot hereunder.

5) <u>ACCOUNTABILITY FOR INVENTORIES</u>  Calamco shall be entitled to actual shrinkage up to a maximum of one-half (1/2%) percent allowance of the weight of Product delivered into its dockside facility at Stockton during each contract year against any shortage, loss or damage to Product.

When the inventory is reconciled at the end of each contract year, the basis for the shrinkage allowance shall be the Product quantity shipped in since the end of the previous contract year (October 31), less the Product quantity shipped out since the last cutoff date.  All quantities shall be expressed in short tons carried to the second decimal position.  Calamco shall reimburse Simplot for losses beyond the maximum allowance at replacement cost  within thirty (30) days from receipt of invoice from Simplot. Replacement cost will be based on Simplot's cost of the first vessel it receives after October 31 of the succeeding year.

6) <u>RIGHT TO INVENTORY</u>  Simplot shall have the right to cause to be taken, during normal business hours, an inventory of all Product in the possession of Calamco upon the giving of reasonable notice to Calamco, which shall be not less than twenty-four (24) hours.

7) <u>TITLE TO PRODUCT</u>  Simplot shall be entitled to receive the amount of Product stored by Calamco, subject to shrinkage as provided herein.  The Product shall remain the property of Simplot while in Calamco's storage.

8) <u>TERM</u>  The first contract year of this Agreement will run from the Facilities final completion date to October 31, 2002.  The initial Term of this Agreement shall be from the Facilities final completion date to October 31, 2011.   Simplot shall have the right to exercise six (6) consecutive five (5) -year options to extend this Agreement beyond October 31, 2011.  Each such option shall be exercised automatically without further notice unless Simplot gives  Calamco not less than  one (1) year's notice that Simplot does not wish the next due option to commence automatically.  Such notice by Simplot shall void all remaining options, if any.

9) <u>THROUGHPUT RATES</u>  Simplot shall pay Calamco an amount per ton as follows:
    a) Pricing from the effective date of this agreement, in conjunction with the completion of the project, will be as follows:
        i)  First One Hundred Thousand (100,000) short tons in each year:  $10.00/short ton  (price includes investment costs)
        ii)  Volume between One Hundred Thousand and One (100,001) short tons and One Hundred and Fifty Thousand (150,000) short tons each year:  $7.00/short ton.
        iii)  Volume in excess of One Hundred and Fifty Thousand (150,000) short tons each year:  $5.00/short ton
    b) After October 31, 2002, pricing will be adjusted on an annual basis to reflect reasonable variable cost changes on an indexed basis, using the Bureau of Labor Statistics Consumer Price Index, U.S. City Average as detailed in their Pacific Cities and U.S. City Average publication (All Urban Consumers; 1982-84=100).  In the event this index is no longer compiled, the parties will agree to an alternate index.  If the parties cannot agree to an alternate index, then the matter shall be referred to and decided by a single arbitrator appointed in accordance with the Commercial Arbitration Rules of the American Arbitration Association or such other organization agreed upon by the parties.
    c) c)  It is the intent of the parties to revisit pricing at the end of the first term (October 31, 2011) and renegotiate the throughput rate to no longer reflect investment costs.  Pricing for the option period commencing November 1, 2011 and ending October 31, 2015, shall be determined as follows: Commencing May 1, 2011, Calamco shall notify Simplot of the throughput rate (price) for the next succeeding contract year (November 1, 2011 through October 31, 2012).  Simplot shall have a period of thirty (30) calendar days within which to object to Calamco's pricing for said contract year.  In the event Simplot does not object, the price set by Calamco shall prevail for said contract year, and the price for the remaining four (4) years of the option period of which that contract year is a part shall be determined in accordance with the Consumer Price Index provisions of Section 9(B) of this Agreement.  In the event Simplot objects to the price

set by Calamco, it shall identify the price it believes is appropriate for said contract year. If the parties cannot agree to a price for the next contract year by June 1, 2011, the matter shall be referred to and decided by a single arbitrator appointed in accordance with the Commercial Arbitration Rules of the American Arbitration Association or such other organization agreed upon by the parties. The Arbitration shall take place in San Francisco, California, and shall be completed not later than September 30, 2011. The prevailing party in such arbitration shall be entitled to recover from the other party its portion of the arbitrator's fees and costs. In the event neither party's throughput price is accepted by the arbitrator, the prevailing party shall be that party whose throughput price is closest to the throughput price determined by the arbitrator.

d) Pricing for each successive option period following the first shall likewise be determined in accordance with the procedures described in Subsection a) of this Section 9.

10)     BILLING   Simplot will pay Calamco, based only on product received during the month, the throughput rates referenced above by the 20th of the following month. This rate will cover all costs, including financing, maintenance, receiving, storage, shipping, administration, and any other costs related to providing services to Simplot as detailed in this agreement. Since the Product belongs to Simplot, no sales taxes will be added to the invoices, except as the State may tax applicable services.

11)   TAXES   Calamco shall pay prior to delinquency all taxes and assessments on the Facilities during the Term of this Agreement. Simplot shall pay any applicable taxes levied against the Product in inventory.

12)   INSURANCE   Calamco shall keep in effect satisfactory comprehensive general liability insurance coverage for the Facilities. Simplot shall be named as an additional insured. Such policy shall provide coverage of at least Five Million Dollars ($5,000,000) for bodily injury to any one person or group of persons per occurrence and Two Million Dollars ($2,000,000) per occurrence property damage. Calamco shall cause a certificate evidencing such coverage to be provided to Simplot, and it shall contain the insurer's agreement to give Simplot thirty (30) days notice of cancellation.

13)   FORCE MAJEURE   Neither Calamco nor Simplot shall be liable for failure to perform or for delay in performing an obligation hereunder when such failure or delay is occasioned by a cause or circumstance beyond the reasonable control of such party (an "Event of Force Majeure") including, but not limited to, the act of any government, compliance with a law or government regulation, act of God, war, riot, insurrection, civil commotion or disturbance, fire, flood or earthquake, stoppage or shortage of fuel supply, strike or lockout of stevedores or crew or other labor trouble, breakdown or stoppage of vessel, failure of the relevant Port Authority to maintain the necessary vessel draft depths for economic delivery, shortage of transportation, or any other such cause or circumstance whether of like or different character. A party claiming an Event of Force Majeure shall give the other party notice thereof no later than three (3) days

after the beginning of the causative event, setting forth a description of such event, an estimate of its effect upon the invoking party's ability to perform its obligations hereunder and the expected duration thereof. The invoking party shall supplement such notice with such other information or documentation as the other party may reasonably request. As soon as practicable after the cessation of such event, the invoking party shall give the other party notice of such cessation. Whenever practicable, a party shall give the other party notice of any threatened or impending Event of Force Majeure. A party whose performance is excused in whole or in part by an Event of Force Majeure shall use reasonable diligence to remedy it.

14)   REMEDY FOR BREACH  Calamco and Simplot agree that in the event of breach or threatened breach of any of the covenants contained herein, other than for failure to pay monies otherwise due from one party to the other, the damage or imminent damage to the other party ("Claimant") shall be inestimable, and therefore any remedy at law or in damages shall be inadequate. Accordingly, in such event the parties agree that Claimant shall be entitled to injunctive relief (including specific performance) against the other party in addition to any other relief (including damages) available to it under this Agreement or under law.

15)   ASSIGNMENT  This Agreement may not be assigned by Calamco or Simplot without the prior written consent of the other party. This Agreement shall be binding upon and inure to the benefit of all successors in interest of Calamco and Simplot.

16)   RIGHT OF FIRST REFUSAL  In the event Calamco offers to sell or accepts an offer to sell any of its UAN handling facilities, including tanks, piping, and associated right-of-way, at the Port of Stockton, it shall first extend that offer to sell or that acceptance to Simplot for Simplot's consideration or for Simplot to match the acceptance terms and conditions. Simplot shall have fifteen (15) business days to accept or match, in which event the parties shall proceed to a timely and orderly closing, or Calamco shall be free to proceed free of such obligations to Simplot.

17)   CONFIDENTIALITY  Calamco and its employees, agents and subcontractors shall not divulge to any person, persons or entity any information gained as a result of or in connection with this Agreement, or any performance relating to this Agreement, and they shall treat all such information furnished or arising under this Agreement as confidential except to the extent required for performance.

18 )   ATTORNEY'S FEES  In the event of litigation arising out of this Agreement, the party prevailing in such litigation shall be entitled, in addition to such other relief as may be granted, to recover its attorney's fees and costs from the losing party.

19)   GOVERNING LAW  This Agreement shall be governed by and construed according to the laws of the State of California.

20)   ENTIRE AGREEMENT   This Agreement, the exhibits hereto, and the minutes of Calamco's Boards of Directors whose "A" and "B" directors approved this Agreement on February 21, 2001, contain the entire understanding between Calamco and Simplot with respect to the subject matter hereof, and supersedes any prior written or oral agreements, between them respecting the subject matter hereof.

21)   COUNTERPARTS   This Agreement may be signed and delivered in counterparts, each of which when so signed and delivered shall together constitute one and the same Agreement.

22)   AMENDMENT   This Agreement may be amended only by a written instrument signed by all of the parties.

23)   SEVERABILITY   If any term, provision, covenant or condition of this Agreement, or the application thereof to any person, place or circumstance, shall be held by a Court of competent jurisdiction to be invalid, unenforceable or void, the remainder of this Agreement and such term, provision, covenant or condition as applied to other persons, places and circumstances shall remain in full force and effect.

24)   NONWAIVER   No failure or neglect of either party in any instance to exercise any right, power or privilege in this Agreement or under law shall constitute a waiver of any other right, power or privilege or of the same right, power or privilege in any other instance.  All waivers by either party must be contained in a written instrument signed by the party to be charged.

25)   NOTICES   Any and all notices required to be given under this Agreement shall be in writing and deemed given ninety-six (96) hours after deposit in the United States mail, certified or registered, with return receipt , or upon confirmed receipt of facsimile transmission, addressed, in the case of CALAMCO,  to:

> CALIFORNIA AMMONIA CO.
> President
> 212 Frank West Circle, Suite E
> Stockton, CA 95206
> Facsimile  (209) 983-0822

And in the case of SIMPLOT to:

> J. R. SIMPLOT COMPANY
> Attention:  Secretary
> P.O. Box 27
> Boise, ID 83707
> Facsimile  (208) 389-7515

A party may, on written notice to the other party, change the address or facsimile to which notices to it are to be sent.

IN WITNESS WHEREOF, the parties have executed these presents the day and year first written above.

**J. R. SIMPLOT COMPANY,**
a Nevada corporation

By: _____

Lawrence S. Hlobik
Senior Vice President

**CALIFORNIA AMMONIA CO.,**
a California corporation

By: _____
Name: Bob Smith
Its: President

STATE OF CALIFORNIA          }
                             } ss.
COUNTY OF San Joaquin        }

On this 21st day of March, 2001, before me, the undersigned, personally appeared Bob Smith, to me known to be the President/CEO of California Ammonia Co., the corporation that executed the within and foregoing instrument, and acknowledged the said instrument to be the free and voluntary act and deed of said corporation for the uses and purposes therein mentioned, and on oath stated that said individual was authorized to execute said instrument.

WITNESS my hand and official seal the day and year first above written.

_____
Notary Public in and for the State of California
Residing at: Manteca, CA
Commission expires: 8/29/2001



PAM MARTIN
Comm. #1149653
NOTARY PUBLIC · CALIFORNIA
SAN JOAQUIN COUNTY
Comm. Exp. Aug. 29, 2001

STATE OF IDAHO      }
                     } ss.
COUNTY OF ADA      }

On this _13th_ day of March, 2001, before me, the undersigned, personally appeared **Lawrence S. Hlobik,** to me known to be the Sr. Vice President of J.R. Simplot Company, the corporation that executed the within and foregoing instrument, and acknowledged the said instrument to be the free and voluntary act and deed of said corporation for the uses and purposes therein mentioned, and on oath stated that said individual was authorized to execute said instrument.

WITNESS my hand and official seal the day and year first above written.

_Margaret A. Cook_
Notary Public in and for the State of Idaho
Residing at: _Boise_
Commission expires: _8/26/2003_



# EXHIBIT 2

# HANDLING and STORAGE AGREEMENT

THIS AGREEMENT is entered into by and between CALIFORNIA AMMONIA CO., a California corporation ("Calamco") and J.R. SIMPLOT COMPANY, a Nevada corporation ("Simplot").

## RECITALS

A) In March 2001, Calamco and Simplot partnered together to address concerns over potential declines in the application of ammonia within California agriculture. In order to maintain Calamco's ability to supply its membership with nitrogen fertilizer, Simplot and Calamco reached agreement for Simplot to bring off-shore fertilizer UAN 32 solutions ("Product") to the Western U.S. market, with Calamco providing to Simplot the off-loading and storage facilities, together with handling activities to accommodate such Product. The Parties wish for this arrangement to continue, and Simplot now desires to increase the volume of imports of Product and Calamco desires to expand its storage facilities with additional tankage ("New Tank") to support this growth.

B) Calamco agrees, at its sole cost, to locate the New Tank at or adjacent to its existing storage facilities at the Port of Stockton and will use reasonable efforts to have the New Tank ready to receive and load-out Product by approximately January 1, 2012. Simplot will have the right to review design and construction plans for the New Tank. The existing off-loading and storage facilities and the New Tank (collectively, "Facilities") shall be used in conjunction with the off-loading and handling activities to accomplish this mutual goal.

C) Calamco and Simplot enter this Handling and Storage Agreement ("Agreement") to supersede said March 2001 agreement, and to set forth the terms and conditions under which both parties will work together to accomplish their interdependent mutual goals. Integral to this Agreement are the obligations that (1) Calamco will construct the New Tank of Thirty Thousand (30,000) short tons, and maintain and operate such Facilities as are capable of receiving and storing Seventy Thousand (70,000) short tons of liquid Product; (2) Simplot, subject to the provisions herein, shall take from the Facilities each contract year of this Agreement, not less than One Hundred Thousand (100,000) short tons of Product (the "Minimum Commitment"); and (3) so long as Simplot is in compliance with the provisions of this Agreement and uses reasonable good faith efforts to meet the Product volume requirements of Calamco shareholders, Calamco will operate the Facilities for the exclusive use of Simplot. For purposes of this Agreement, "meeting the Product volume requirements of Calamco shareholders" means fulfilling market orders placed by identified Calamco shareholders at Simplot's then applicable prices, contract/ordering requirements, delivery schedules and Terms and Conditions of Sale. In the event Calamco expresses an interest to use a portion of the Facilities (e.g. the load-out equipment) for distribution of a different product from a new tank that might be constructed in the future, Calamco must first obtain the consent of Simplot, which will not be unreasonably withheld so long as such use does not have the effect of: i) restricting Simplot's import/intake or distribution of Product; ii) interfering with Calamco's

ability to provide services under this Agreement; or iii) creating a material detriment to Simplot.

1) <u>DELIVERY and HANDLING</u>   Simplot shall cause Product to be delivered to Calamco's Port of Stockton receiving terminal.   Such deliveries shall be coordinated with Calamco to reduce or eliminate delays and demurrages that might otherwise occur.

   a) Product shall not be commingled with similar materials belonging to any other party whatsoever, unless otherwise mutually agreed by both parties or provided herein.

   b) Calamco shall accept delivery of Product at vessel's discharge flange at receiving load arm to its dockside receiving terminal at the Port of Stockton, California.

   c) Calamco shall do and perform all things necessary in Calamco's reasonable opinion for the efficient off-loading, storage, handling and reloading of the Product including, but not limited to:

      i) Furnishing the personnel and equipment required to perform the obligations under this Agreement.

      ii) Taking reasonable precautions to protect the quality of the Product from common and harmful contaminants that are associated with storage and handling of Product, as well as from theft and the elements of nature.   Quantity received will be determined by an independent surveyor at Calamco's expense.

      iii) Unloading, transferring and receiving Product from vessels into the Facilities at a rate of 600 short tons per hour.  Any compensation for dispatch time will be shared equally by Calamco and Simplot.

      iv) Loading Product from the Facilities into trucks and railcars provided or arranged by Simplot at a rate of 200 short tons per hour.

      v) Determining weight on all outbound transport by use of certified scales or meters.

      vi) Performing appropriate receipts, releases, and the like in Simplot's information system, as separately addressed and agreed to.

   d) Calamco shall provide for Simplot all necessary related transactions and other services as agreed to from time to time by the parties, including the issuance of receipts upon delivery of Product to the Facilities, receipt of Simplot's orders, the handling of warehouse release forms, truck scale tickets or equivalent, inventory reports and general correspondence.

      i) Calamco shall invoice Simplot monthly for the services furnished hereunder at the rates set forth herein, and shall, at the time of such invoicing, provide Simplot with a statement setting forth the tonnage received and shipped during each invoiced period.

      ii) Calamco shall furnish Simplot an Inventory Activity Report for each calendar month by the 5th business day of the following calendar month.   This report should include opening inventory balances, addition of each receipt and subtraction of each shipment during the

month along with their corresponding Simplot release numbers, and the resulting closing inventory balances.

2) <u>EXPERTISE</u>  Calamco represents and warrants to Simplot that it has the expertise and the personnel to fulfill its obligations under this Agreement and, in particular, to comply with good industry practices and all environmental laws, rules and regulations applicable to this Agreement.

3) <u>DEMURRAGE LIABILITY</u>  Calamco agrees to use reasonable commercial efforts to arrange immediate dock space at the Port of Stockton for the unloading of the vessels procured by Simplot, and any demurrage relating to such vessel, unless caused by Calamco, shall be for the account of Simplot.  In the event of a timing conflict between a Calamco-arranged vessel and a Simplot-arranged vessel, the parties will work together to reasonably resolve the needs of both.  It is understood by the parties that, in the event of an unavoidable conflict due to simultaneous deliveries of NH3 and Product, the NH3 delivery shall have priority.

Calamco and Simplot specifically agree that the unloading of vessels shall be performed as soon as possible after the vessel has arrived, twenty-four (24) hours a day, seven (7) days a week, during both shipping and non-shipping seasons.

4) <u>QUANTITY</u>  Simplot shall cause to be put through the Facilities not less than the Minimum Commitment described in C) above. Simplot will provide quarterly and annual activity forecasts for Calamco's planning needs.  Calamco explicitly acknowledges the possible overlapping seasonality of receiving and shipping for itself and for Simplot, and warrants it has the ability to handle throughput equal to Simplot's ability to deliver and to remove Product.  Further, Calamco warrants that services it provides or may provide to third-party businesses will not adversely impact its ability to perform its obligations to Simplot hereunder.  The Parties have expressed mutual interest in adding other liquid fertilizer products to be stored and processed through the Facilities.

5) <u>ACCOUNTABILITY FOR INVENTORIES</u>   Calamco shall be entitled to actual shrinkage up to a maximum of one-half (1/2%) percent allowance of the weight of Product delivered into its dockside facility at Stockton during each contract year against any shortage, loss or damage to Product.

When the inventory is reconciled at the end of each contract year, the basis for the shrinkage allowance shall be the Product quantity shipped in since the end of the previous contract year (October 31), less the Product quantity shipped out since the last cutoff date. All quantities shall be expressed in short tons carried to the second decimal position.  Calamco shall reimburse Simplot for losses beyond the maximum allowance at replacement cost  within thirty (30) days from receipt of invoice from Simplot. Replacement cost will be based on Simplot's cost of the first vessel it receives in the succeeding year (after October 31).

6) <u>RIGHT TO FORMAL INVENTORY AUDIT</u>  Simplot shall have the right to cause to be taken, during normal business hours, an inventory of all Product in the possession of Calamco upon the giving of reasonable notice to Calamco, which shall be not less than twenty-four (24) hours.

7) <u>TITLE TO PRODUCT</u>  Simplot shall be entitled to receive the amount of Product stored by Calamco, subject to shrinkage as provided herein.  The Product shall remain the property of Simplot while in Calamco's storage.

8) <u>TERM</u>  The first contract year of this Agreement shall begin on November 1, 2011 and will run to October 31, 2012.  The initial Term of this Agreement shall run for five (5) years from the beginning of the first contract year to October 31, 2016.  Simplot shall have the right to exercise seven (7) consecutive five (5) year options to extend this Agreement beyond October 31, 2016.  Each such option shall be exercised automatically without further notice unless Simplot gives Calamco not less than one (1) year's notice that Simplot does not wish the next due option to commence automatically.  Such notice by Simplot shall void all remaining options, if any.

9) <u>THROUGHPUT RATES</u>  From the effective date of the Agreement until the month following the completion date of the New Tank, Simplot shall pay Calamco an agreed upon fixed rate of $8.60/ton.  From the first day of the month following completion of the New Tank forward, Simplot shall pay Calamco an amount per ton as follows:
   a) Pricing for the Initial Term of this Agreement will be as follows:
      i) First One Hundred Thousand (100,000) short tons in each year: Investment Rate (as described in Section 9c) below).
      ii) Volume in excess of One Hundred Thousand (100,000) up to One Hundred and Fifty Thousand (150,000) short tons each year: Investment Rate less a discount of $0.80 per short ton.
      iii) Volume in excess of One Hundred and Fifty Thousand (150,000) short tons each year: Standard Rate (as described in Section 9d) below).
      iv) Any deficit between actual volume for the contract year and Minimum Commitment (One Hundred Thousand (100,000) short tons): Shortfall Rate (as described in Section 9f) below).
   b) Pricing after the Initial Term will be at the Standard Rate for all tons (as the investment costs for the New Tank will have been recouped), and the Shortfall Rate will be charged for any deficit between actual volume for the contract year and the Minimum Commitment (One Hundred Thousand (100,000) short tons).
   c) The Investment Rate will be based upon the actual construction costs of the New Tank divided by 750,000, not to exceed $3.67/short ton, plus 1) actual Port of Stockton charges to Calamco for each throughput ton (expected to be $2.91 as of July 1, 2011), 2) a fixed amount of $1.78/short ton as the agreed upon interest and profit margin, and 3) operating costs, which will begin at $2.52/short ton for the first contract year, and will be subject to annual adjustment as described in d) below.  The Investment

Rate for the first contract year shall be calculated accordingly ($10.88 = $3.67 + $2.91 + $1.78 + $2.52) and shall remain fixed for the entire contract year.  The Investment Rate will be adjusted only at the beginning of each contract year for increases or decreases in the actual port charges and the CPI Factor (as specified in Section 9d) below) for operating costs.

d)  The Standard Rate will be the total of: 1) actual Port of Stockton charges to Calamco for each throughput ton (expected to be $2.91 as of July 1, 2011), 2) a fixed amount of $3.07/short ton as the agreed upon interest and profit margin, and 3) operating costs, which will begin at $2.52/short ton for the first contract year, and will be subject to adjustment (the "CPI Factor") on an annual basis to reflect reasonable variable cost changes on an indexed basis, using the Bureau of Labor Statistics Consumer Price Index, U.S. City Average as detailed in their Pacific Cities and U.S. City Average publication (All Urban Consumers; 1982-84=100).  In the event this index is no longer compiled, the parties will agree to an alternate index.  If the parties cannot agree to an alternate index, then the matter shall be referred to and decided by a single arbitrator appointed in accordance with the Commercial Arbitration Rules of the American Arbitration Association or such other organization agreed upon by the parties.  The Standard Rate for the first contract year shall be $8.50 ($2.91 + $3.07 + $2.52) and shall remain fixed for the entire contract year.  The Standard Rate will be adjusted only at the beginning of each contract year (for increases or decreases in the actual port charges and the CPI Factor for operating costs).

e)  While it is intended that the pricing formula described in this Section will remain valid for the entire term (including all extensions) of this Agreement, the parties agree that starting with the third extension of the Agreement, in the event Simplot has not provided throughput volumes of at least 600,000 tons of Product through the Facilities in the first  four years of the previous option period, Calamco may upon six months written notice prior to the commencement of the third extension of the Agreement and/or prior to each extension period thereafter, request to revisit the pricing formula.  In revisiting the pricing, the parties  acknowledge that Simplot has paid a front-loaded Investment Rate relating to the construction of the tank during the first term of this Agreement, and that throughput rates in future years should be established to include only the Standard Rate components as described in Section 9d), specifically port charges, interest and profit margin, and operating costs.  To clarify, if Product throughput for the November 1, 2021 through October 31, 2025 time period does not meet or exceed 600,000 tons, pricing for the option period commencing November 1, 2026 and ending October 31, 2031 shall be determined as follows.  Prior to May 1, 2026, Calamco shall notify Simplot in writing of the throughput rate (price) for the next succeeding contract year (November 1, 2026 to October 31, 2027).  Simplot shall have a period of thirty (30) calendar days within which to object to Calamco's pricing for said contract year.  In the event Simplot does not

object, the price set by Calamco shall prevail for said contract year, and the price for succeeding years shall be determined in accordance with said throughput rate, and consistent with any provisions of Section 9d) of this Agreement, whereby the port charges portion of the price shall be adjusted for actual revisions in Port of Stockton charges and the operating costs portion of the price shall be adjusted annually by the CPI Factor. In the event Simplot objects to the price set by Calamco using the procedure above, Simplot shall identify the price it believes is appropriate. If the parties cannot agree to a price by 60 days after the beginning of the option period, the matter shall be referred to and decided by a single arbitrator appointed in accordance with the Commercial Arbitration Rules of the American Arbitration Association or such other organization agreed upon by the parties. The Arbitration shall take place in San Francisco, California, and shall be completed no later than 180 days after the beginning of the contract year. Each party shall bear its own costs and attorney fees during the course of the arbitration process. Pending completion of the arbitration process, payments shall continue in effect under the then existing pricing formula.

f)  The Shortfall Rate shall be charged at the end of any contract year in which Simplot does not meet the Minimum Commitment, however in the first contract year, for purposes of calculating the Shortfall Rate, the Minimum Commitment shall be pro-rated to the number of months the New Tank has been in service during the contract year. The Shortfall Rate shall be calculated as the total of the Investment Rate (for the Initial Term only) or Standard Rate (for all extended Terms) less the Port of Stockton charge, less any reduction in the operating costs as a result of the shortfall. The rate is reduced by the port charges, as Calamco will only be assessed port charges for actual throughput volume. See Exhibit A for further clarification.

g)  If Simplot requests new and additional services beyond normal operations (such as, but not limited to, those services described in Section 1c) which would increase the operating costs beyond contract amounts ($2.52/short ton for first year, and revised annually for the CPI Factor), Calamco will inform Simplot of the itemized expected increase in operating costs for such new and additional services, and Simplot will determine whether to proceed with the new and additional services and, if accepted, will agree to revise the price paid for operating costs for the contract year and all future years, accordingly.

10)   __BILLING__  Simplot will pay Calamco, based only on product shipped from the Facilities during the month, the throughput rates referenced above by the 20th of the following month. This rate will cover all costs, including financing, maintenance, receiving, storage, shipping, administration, and any other costs related to providing services to Simplot as detailed in this agreement. Since the Product belongs to Simplot,

no sales taxes will be added to the invoices, except as the State may tax applicable services.

11)   <u>TAXES</u>   Calamco shall pay prior to delinquency all taxes and assessments on the Facilities during the Term of this Agreement.  Simplot shall pay any applicable taxes levied against the Product in inventory.

12)   <u>INSURANCE</u>   Calamco shall keep in effect satisfactory comprehensive general liability insurance coverage for the Facilities.  Simplot shall be named as an additional insured.  Such policy shall provide coverage of at least Five Million Dollars ($5,000,000) for bodily injury to any one person or group of persons per occurrence and Two Million Dollars ($2,000,000) per occurrence property damage.   Calamco shall cause a certificate evidencing such coverage to be provided to Simplot, and it shall contain the insurer's agreement to give Simplot thirty (30) days notice of cancellation.

13)   <u>FORCE MAJEURE</u>   Neither Calamco nor Simplot shall be liable for failure to perform or for delay in performing an obligation hereunder when such failure or delay is occasioned by a cause or circumstance beyond the reasonable control of such party (an "Event of Force Majeure") including, but not limited to, the act of any government, compliance with a law or government regulation, act of God, war, riot, insurrection, civil commotion or disturbance, fire, flood or earthquake, stoppage or shortage of fuel supply, strike or lockout of stevedores or crew or other labor trouble, breakdown or stoppage of vessel, failure of the relevant Port Authority to maintain the necessary vessel draft depths for economic delivery, shortage of transportation, or any other such cause or circumstance whether of like or different character. A party claiming an Event of Force Majeure shall give the other party notice thereof no later than three (3) business days after the Force Majeure event, setting forth a description of such event, an estimate of its effect upon the invoking party's ability to perform its obligations hereunder and the expected duration thereof. The invoking party shall supplement such notice with such other information or documentation as the other party may reasonably request.  As soon as practicable after the cessation of such event, the invoking party shall give the other party notice of such cessation.  Whenever practicable, a party shall give the other party notice of any threatened or impending Event of Force Majeure.  A party whose performance is excused in whole or in part by an Event of Force Majeure shall use reasonable diligence to remedy it.

14)   <u>REMEDY FOR BREACH</u>   Calamco and Simplot agree that in the event of breach or threatened breach of any of the covenants contained herein, other than for failure to pay monies otherwise due from one party to the other, the damage or imminent damage to the other party ("Claimant") shall be inestimable, and therefore any remedy at law or in damages shall be inadequate.  Accordingly, in such event the parties agree that Claimant shall be entitled to injunctive relief (including specific performance) against the other party in addition to any other relief (including damages) available to it under this Agreement or under law.

15)    <u>NO ASSIGNMENT/CONTRACT BINDING UPON SUCCESSORS</u>    This Agreement may not be assigned by Calamco or Simplot without the prior written consent of the other party. This Agreement shall be binding upon and inure to the benefit of all successors in interest of Calamco and Simplot.

16)    <u>RIGHT OF FIRST REFUSAL</u>  Calamco may not sell or lease any of the Facilities without the consent of Simplot.  In the event Simplot consents, and Calamco offers to sell or lease or accepts an offer to sell or lease any of the Facilities, including tanks, piping, and associated right-of-way, at the Port of Stockton, it shall first extend that offer or that acceptance to Simplot for Simplot's consideration or for Simplot to match the acceptance terms and conditions.  Simplot shall have fifteen (15) business days to accept or match, in which event the parties shall proceed to a timely and orderly closing, or Calamco shall be free to proceed free of such obligations to Simplot.

17)    <u>CONFIDENTIALITY</u>  Each party and its employees, agents and subcontractors shall not divulge to any person, persons or entity any information gained as a result of or in connection with this Agreement, or any performance relating to this Agreement, and they shall treat all such information furnished or arising under this Agreement as confidential except to the extent required by law or for performance hereunder.

18 )    <u>ATTORNEY'S FEES</u>  In the event of litigation arising out of this Agreement, the party prevailing in such litigation shall be entitled, in addition to such other relief as may be granted, to recover its attorney's fees and costs, including, but not limited to the fees and costs of expert witnesses from the losing party.

19)    <u>GOVERNING LAW</u>    This Agreement shall be governed by and construed according to the laws of the State of California.

20)    <u>ENTIRE AGREEMENT</u>  This Agreement, including the recitals herein and the exhibits hereto contain the entire understanding between Calamco and Simplot with respect to the subject matter hereof, and supersedes any prior written or oral agreements, between them respecting the subject matter hereof. This Agreement was approved by Calamco's Board of Directors, as reflected in the minutes of the Board of Directors meeting of June 16, 2011.

21)    <u>COUNTERPARTS</u>    This Agreement may be signed and delivered in counterparts, each of which when so signed and delivered shall together constitute one and the same Agreement.

22)    <u>AMENDMENT</u>  This Agreement may be amended only by a written instrument signed by all of the parties.

23)    <u>SEVERABILITY</u>  If any term, provision, covenant or condition of this Agreement, or the application thereof to any person, place or circumstance, shall be held by a Court of competent jurisdiction to be invalid, unenforceable or void, the remainder of this

Agreement and such term, provision, covenant or condition as applied to other persons, places and circumstances shall remain in full force and effect.

24)   <u>NONWAIVER</u>   No failure or neglect of either party in any instance to exercise any right, power or privilege in this Agreement or under law shall constitute a waiver of any other right, power or privilege or of the same right, power or privilege in any other instance.   All waivers by either party must be contained in a written instrument signed by the party to be charged.

25)   <u>NOTICES</u>   Any and all notices required to be given under this Agreement shall be in writing and deemed given ninety-six (96) hours after deposit in the United States mail, certified or registered, with return receipt, or upon confirmed receipt of facsimile transmission, addressed, in the case of CALAMCO,  to:

> CALIFORNIA AMMONIA CO.
> President
> 1776 West March Lane, Suite 420
> Stockton, CA 95207
> Facsimile  (209) 983-0822

And in the case of SIMPLOT to:

> J. R. SIMPLOT COMPANY
> Attention:  Secretary
> P.O. Box 27
> Boise, ID 83707
> Facsimile  (208) 389-7515

A party may, on written notice to the other party, change the address or facsimile to which notices to it are to be sent.

IN WITNESS WHEREOF, the parties have executed these presents the day and year first written above.

**J. R. SIMPLOT COMPANY,**
a Nevada corporation


By: _____
Garrett Lofto
Senior Vice President


**CALIFORNIA AMMONIA CO.,**
a California corporation

By: _Robert C Brown_

       Robert Brown
       President

STATE OF CALIFORNIA    }
                           ss.
COUNTY OF SAN JOAQUIN   }

On this 16th day of June, 2011, before me, the undersigned, personally appeared **Robert Brown,** to me known to be the President of California Ammonia Co., the corporation that executed the within and foregoing instrument, and acknowledged the said instrument to be the free and voluntary act and deed of said corporation for the uses and purposes therein mentioned, and on oath stated that said individual was authorized to execute said instrument.

WITNESS my hand and official seal the day and year first above written.

_Pam Martin_
Notary Public in and for the State of California
Residing at: Stockton, CA
Commission expires: 8/29/2013

> PAM MARTIN
> Commission # 1859614
> Notary Public - California
> San Joaquin County
> My Comm. Expires Aug 29, 2013

STATE OF IDAHO    }
                    } ss.
COUNTY OF ADA    }

On this 15th day of June, 2011, before me, the undersigned, personally appeared **Garrett Lofto,** to me known to be the Sr. Vice President of J.R. Simplot Company, the corporation that executed the within and foregoing instrument, and acknowledged the said instrument to be the free and voluntary act and deed of said corporation for the uses and purposes therein mentioned, and on oath stated that said individual was authorized to execute said instrument.

WITNESS my hand and official seal the day and year first above written.

_Bonnie Hodges_
Notary Public in and for the State of Idaho
Residing at: Boise, ID
Commission expires: 6/27/12

> BONNIE HODGES
> NOTARY PUBLIC
> STATE OF IDAHO

EXHIBIT A

CLARIFICATION OF SHORTFALL CALCULATION:

For the purposes of this example, assume that the Agreement is in year six, and that actual port charges have risen to $3.20/st and CPI factors have increased the operating costs charge to $2.75/st.   Under these assumptions, the Standard Rate would be $9.02/st ($3.20 + $3.07 + $2.75).   Furthermore, assume that Simplot ships 70,000 st from the Facilities during the contract year, and that Calamco's actual operating costs for the 70,000 st totaled $210,000 (or $3.00/st of throughput).

Under this scenario, Simplot will have fallen 30,000 st below the Minimum Commitment, during the contract year and would be required to compensate Calamco for the shortfall. The Shortfall Rate in this instance would be the Standard Rate ($9.02/st), less the port charges ($3.20/st), less any reduction in operating costs.   The reduction in operating costs would be calculated as the difference between the $2.75 operating cost charge for all 100,000 tons ($275,000) and the actual operating costs (in this case, $210,000), for a difference of $65,000.

Therefore, Simplot would pay Calamco $109,600 as a result of the shortfall, calculated as ((30,000 * ($9.02 - $3.20)) – ($275,000 - $210,000)).

As a further example, if Simplot completed the contract year with no throughput of Product, and the actual operating costs were $50,000 (for maintenance to the Facilities), the payment to Calamco would be $357,000 ((100,000 * ($9.02 - $3.20)) – ($275,000 – $50,000)).

# EXHIBIT 3

## AMENDMENT TO HANDLING & STORAGE AGREEMENT

This Amendment to Handling & Storage Agreement (this "Amendment") is entered into this 11th day of March, 2020, by and between CALAMCO ("CALAMCO"), on the one hand, and J. R. SIMPLOT COMPANY ("Simplot"), on the other, with respect to that certain Handling and Storage Agreement between them dated June 16, 2011 ("Agreement"). For purposes of this Amendment, the term "Party" shall mean either party to this Amendment, and the term "Parties" shall mean CALAMCO and Simplot.

### RECITALS

A.      The Agreement is in effect, with a current termination date of October 31, 2021 unless automatically extended pursuant to *Section 8 Term* in the Agreement.

B.      The purpose of this Amendment is to allow CALAMCO the use of inbound piping which, under the Agreement, is currently for the exclusive use of Simplot.

### AGREEMENT

**NOW, THEREFORE**, based upon the preceding Recitals, which are incorporated herein, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      Recital C of the Agreement is amended to add the following sentence at the end: "Nothing contained in this Recital C shall prohibit CALAMCO from utilizing the inbound piping for its own purposes, so long as the use does not interfere with Simplot's ability to obtain delivery of Product."

2.      Section 1) a) shall be amended to add the following at the end of the subsection: "Use by CALAMCO of the inbound piping shall not be considered a violation of this Subsection 1) a), or any other provision of this Agreement.

3.      In all other respects the Agreement shall remain in full force and effect.

Dated:                                          CALAMCO
11th MARCH, 2020

By_____
                                                Dan Stone, President


Dated:                                          J. R. SIMPLOT COMPANY
12 March 2020

By_____
                                                R. SUNDERLAND

[612511v]

# EXHIBIT 4

| | |
|---|---|
| **From:** | Dan Stone |
| **Sent:** | Thursday, March 12, 2020 9:23 AM PDT |
| **To:** | Case Van Steyn; Alan Freese; DeVaney, Doug; Bardin Bengard; Sunderland, Richard; Reinhardt, G.Rey |
| **Subject:** | [EXTERNAL] Calamco Update |

[Warning: External Email]

Here is a brief business update since our Feb 20 Board meeting....

1. On UAN, Simplot decided to NOT pursue a modification in the business model with Calamco. Simplot agreed to amend the storage & handling contract to allow Calamco to use the piping, which saves Calamco ~$0.5M in capital IF Calamco decides to construct a UAN tank.

2. Calamco purchased 6K tons of NH3 on a spot basis from Simplot - starting rail delivery in late March. This saves ~$120K in costs vs. the most recent ship delivery.

# EXHIBIT 5

**Superior Court of California, County of San Joaquin**

## MINUTE ORDER

**Date:** 03/05/2021 08:45 AM                         **Case Number:** STK-CV-UWM-2020-0008589

**Cal Ida Chemical Company  vs  Dan Stone**

**Event Type:** CMC: Further Case Management            **Department:** 10D
Conference, Petition for Writ of Mandate

---

**Appearances:** Presiding Judge: Barbara Kronlund. Private Attorney, Adam Ramirez, appears for Petitioner, G. Rey Reinhardt. Private Attorney, Adam Ramirez, appears for Petitioner, Richard Sunderland. Private Attorney, Adam Ramirez, appears for Petitioner, Chris Shelden. Private Attorney, Adam Ramirez, appears for Petitioner, Cal Ida Chemical Company, a California corporation. Private Attorney, Adam Ramirez, appears for Respondent, Richard Sunderland. Private Attorney, Adam Ramirez, appears for Respondent, Calida Chemical Company, a California Corporation. Private Attorney, Adam Ramirez, appears for Respondent, G. Rey Reinhardt. Private Attorney, Adam Ramirez, appears for Respondent, Chris Shelden. . Also attending: alittle  Court Clerk.

---

Telephonic appearance by counsel for Petitioners
Telephonic appearance by Michael Clyde, counsel for Calamco

Counsel indicates that they are not contesting the tentative ruling.

The Court affirms the tentative ruling as follows: TENTATIVE RULING NOTICE


Beginning May 4, 2020, all Civil Departments will resume hearings for all Case Management Conferences, Law and Motion matters, Settlement Conferences and Ex Parte matters.  Given the Covid-19 pandemic, the Orders of the Governor, the Orders of the Chief Justice, and the Orders of the Presiding Judge of San Joaquin County, all civil hearings will be held remotely by telephone or videoconference, no in person appearances will be allowed. The Court will notify parties or their counsel of the call-in numbers for the hearings.  At this time, we are not able to provide information over the phone.  To communicate with the Courtroom Clerk of the Civil department to which your case is assigned, please email questions to civilcourtclerks@sjcourts.org, indicating  in the title of the email the Department, Case number, Case Name, and party's name. The Civil Clerk assigned to the department handling your case will return your email.

Tentative rulings for Law and Motion will be posted electronically by 1:30 p.m. the day before the hearing.  Any party wishing to contest or argue the tentative ruling must email the court at civilcourtclerks@sjcourts.org. that they intend to appear remotely no later than 4:00 PM on the day before the scheduled hearing.  The Department and Case Number must be in the header of the email.  The email must include the Department, Case number, Case Name, Motion, party's name and email, date and time of the hearing, issues they plan to argue, and that they have informed the opposing party.  The party must also notify affected counsel, or unrepresented parties, that they intend to appear, no later than 4:00 PM on the day before the scheduled hearing.  Unless the Court and opposing counsel have been notified, the tentative ruling shall become the ruling of the Court without oral argument.

To attend the remote hearing with Judge Kronlund in Dept. 10-D: Call into (209) 992-5590, then follow the prompts and use the Bridge # and Pin # as follows:

Bridge # 6940
Pin # 3782


Tentative Ruling

COURT IS ISSUING ONE TENTATIVE FOR BOTH WRIT PETITIONS ON CALENDAR THIS DATE

---

There are cross petitions in this consolidated case. In Case No. STK-CV-UWM-2020-8589, Richard Sunderland, G. Rey Reinhardt, Chris Shelden (the "Class B Directors") and Cal Ida Chemical Company (collectively, "Petitioners") filed a petition for writ of mandate against Dan Stone, CEO of CALAMCO, to compel access to corporate records and information regarding CALAMCO's proposed UAN32 project. Then, in Case No. STK-CV-UWM-2020-8980, CALAMCO petitioned for a writ of mandate to compel the Class B Directors to attend board meetings, or to excuse the quorum requirement for those meetings. The cases were consolidated by the parties' stipulation and this Court's order dated December 1, 2020. As more fully set forth below, the petition filed by the Class B Directors and Cal Ida Chemical Company is GRANTED, and CALAMCO's petition is DENIED WITHOUT PREJUDICE.

Both parties have also sought declaratory relief, which appears to be derivative of their other claims. The Court's decision as discussed above, constitutes the Court's declaration of the parties' respective rights and obligations in connection with the matters raised in the petitions.

After the writ petition is filed, the court determines whether to issue an alternative writ. (See Code Civ. Proc. 1087.) In this case, the court issued an alternative writ in Case No. 2020-8589 on October 23, 2020. Thereafter, the cases were consolidated by stipulation of the parties and the court's order dated December 1, 2020. After the alternative writ is issued, the opposing party may file a Return, either by demurrer or verified answer. (see Code Civ. Proc. 1089.) Both parties have filed verified answers in this case. If the return raises a disputed question of fact that is necessary to the determination of the petition, the court may order the matter tried to a jury. (See Code Civ. Proc. 1090.) If the return raises only questions of law, and/or factual issues that are not necessary to the determination of the petition and not affecting the substantial rights of the parties, the court proceeds with oral argument and determines the merits of the petition. (Code Civ. Proc. 1094.) Ordinarily, evidence at a law and motion hearing is presented by declaration and/or request for judicial notice. (Rules of Court, rule 3.1306(a).) In order to present oral evidence, a party must file a written request at least three days before the hearing stating the nature and extent of the evidence proposed and a time estimate for the hearing. (Rules of Court, rule 3.1306(b).)

Here, there does not appear to be any disputed factual issue raised by the return to either petition that is necessary to resolution of the petitions. If the parties disagree with this conclusion, they should request oral argument and be prepared to demonstrate precisely which factual matters are necessary to be resolved before the court may decide the petition. If the court is persuaded that any factual issues are necessary to determine the petitions, the court will set the matter for trial. Otherwise, the court will hear oral argument (if requested) and determine the merits of the petitions. In any case, no oral testimony will be allowed at the hearing. Neither party has filed a written request pursuant to rule 3.1306, and if the parties feel oral evidence is required to resolve a factual dispute that is necessary to the determination of the petitions, the matter will be set for trial and the evidence presented there.

Respondent's Request for Judicial Notice

As a threshold matter, the court takes judicial notice of the documents filed in support of CALAMCO's petition (Case No. STK-CV-UWM-2020-8980) as court records. (Evid. Code § 452(d).) The court will not take judicial notice of the truth of any matters asserted in the documents. (Day v. Sharp (1975) 50 Cal.App.3d 904, 914.) However, because the parties have stipulated to consolidation of the petitions, the court will consider those documents as if they were filed in support of the Petition filed by the Class B Directors and Cal Ida. (Stubblefield Construction Co. v. City of San Bernardino (1995) 32 Cal.App.687, 701.) The fact that the two petitions are consolidated means the petitions are now a single case, and the documents filed in either are now relevant to both. The cases of Diego v. Pilgrim United Church of Christ (2014) 231 Cal.App.4th 913 and People ex rel. Lockyer v. Shamrock Foods Co. (2000) 24 Cal.4th 415, cited by Petitioners in opposition to the request for judicial notice (filed prior to the consolidation), are inapposite because there was no consolidation in those cases.

Petitioners' Objections to Respondent's Evidence

As a further threshold matter, Petitioners argue in their Reply to Respondent's Response to their Objections to Evidence that declarations are not admissible at trial, and thus all of Petitioners' objections should be sustained. Petitioners rely on Elkins v. Superior Court (2007) 41 Cal.4th 1337, in which the court held declarations could not be used in a divorce trial. (Id. at 1354.) Neither party has presented any authority applying this rule to proceedings other than a traditional trial. Section 1090 of the Code of Civil Procedure allows the court to order a jury trial prior to deciding a writ petition, but that has not occurred in this case. The court will consider the declarations.

Declaration of Dan Stone

The objection to paragraph 6 is OVERRULED. The declarant was present at the interview, and therefore the testimony has foundation. The testimony is a description of the subject matter of a conversation, not a specific out-of-court statement, and thus is not hearsay. (See Hair v. McGuire (1961) 188 Cal.App.2d 348, 357; Browne v. Turner Construction Co. (2005) 127 Cal.App.4th 1334, 1348-1349.)

The objection to paragraph 7 is OVERRULED. As a high-level employee since 2014, the declarant has personal knowledge of what the board has approved. The testimony is not hearsay because it is a description of what the Board and corporation have done, not what anyone has said.

The objection to paragraph 8 is SUSTAINED for lack of foundation. Contrary to Respondent's response to the objection, the declarant does not state that he attended or participated in the Strategic Planning Meeting, nor how he learned the information contained in this paragraph.

The objection to paragraph 9 is OVERRULED. The declarant was a party to the conversations described, therefore the testimony has foundation. The testimony is a description of the subject matter of conversations, not a specific out-of-court statement, and thus is not hearsay. (See Hair v. McGuire (1961) 188 Cal.App.2d 348, 357; Browne v. Turner Construction Co. (2005) 127 Cal.App.4th 1334, 1348-1349.)

The objection to paragraph 11 is OVERRULED. The declarant was present at the meeting, therefore the testimony has foundation. The testimony is a description of the subject matter of a presentation, not a specific out-of-court statement, and thus is not hearsay. (See Hair v. McGuire (1961) 188 Cal.App.2d 348, 357; Browne v. Turner Construction Co. (2005) 127 Cal.App.4th 1334, 1348-1349.)

The objection to paragraph 12 is SUSTAINED. Purported statements by Mr. Doug Stone and Mr. Dufault are hearsay, and do not appear to qualify for any exception to the hearsay rule.

The objection to paragraph 13 is OVERRULED. The testimony concerns the declarant's own conversations, and does not lack foundation. The testimony states that certain information was left out, and "various business opportunities and alternatives" were discussed. This testimony is a description and does not repeat a statement, and thus is not hearsay. The testimony does not contain any improper legal conclusions or opinions, but rather relays the declarant's own understanding and concerns.

The objection to paragraph 14 is OVERRULED. The testimony is hearsay, but falls under an exception to the hearsay rule as a statement by a party opponent. (Evid. Code § 1220.)

The objection to paragraph 15 is OVERRULED. The testimony appears to be intended as a statement of the declarant's own understanding and not a legal conclusion as to the effect of the agreement. The court will only consider the evidence for proper purposes.

The objection to paragraph 16 is OVERRULED. The testimony contains no opinions. References made to the allegations of Respondent's Petition do not render this testimony inadmissible.

The objection to paragraph 17 is OVERRULED. The testimony appears to be intended as a statement of the declarant's own understanding and not a legal conclusion as to the effect of the agreement. The court will only consider the evidence for proper purposes. The testimony is a description of communications rather than a

statement, and thus is not hearsay, but to the extent the testimony refers to the act of agreeing, it falls under the verbal acts exception to the hearsay rule.

The objection to paragraph 18 is OVERRULED. The declarant was present at the meeting, so the testimony does not lack foundation. The testimony is a description of the subject matter of conversations, not a specific out-of-court statement, and thus is not hearsay. (See Hair v. McGuire (1961) 188 Cal.App.2d 348, 357; Browne v. Turner Construction Co. (2005) 127 Cal.App.4th 1334, 1348-1349.) The testimony appears to be intended as a statement of the declarant's own understanding and not a legal conclusion. The court will only consider the evidence for proper purposes.

The objection to paragraph 19 is OVERRULED. The testimony concerns the declarant's own thoughts, and does not lack foundation. The testimony appears to be intended as a statement of the declarant's own understanding and not a legal conclusion or expert opinion. The court will only consider the evidence for proper purposes.

The objection to paragraph 21 is SUSTAINED for lack of foundation.

The objection to paragraph 22 is SUSTAINED as to statement regarding Simplot's manufacturing numbers, for lack of foundation. Objections to the remainder of the testimony is OVERRULED.

The objection to paragraph 23 is OVERRULED. The declarant has laid sufficient foundation for his knowledge of markets in which CALAMCO and Simplot are competitors.

The objection to paragraph 24 is OVERRULED. The testimony concerns the declarant's own thoughts, and does not lack foundation. The testimony appears to be intended as a statement of the declarant's own understanding and not a legal conclusion or expert opinion. The court will only consider the evidence for proper purposes.

The objection to paragraph 25 is OVERRULED. The testimony concerns the declarant's own thoughts, and does not lack foundation. The testimony appears to be intended as a statement of the declarant's own understanding and not a legal conclusion or expert opinion. The court will only consider the evidence for proper purposes.

The objection to paragraph 26 is OVERRULED. The testimony concerns the declarant's own thoughts, and does not lack foundation. The testimony appears to be intended as a statement of the declarant's own understanding and not a legal conclusion or expert opinion. The court will only consider the evidence for proper purposes.

The objection to paragraph 27 is OVERRULED. The testimony concerns the declarant's own thoughts and experiences, and does not lack foundation. The testimony appears to be intended as a statement of the declarant's own understanding and not a legal conclusion or expert opinion. The court will only consider the evidence for proper purposes.

Declaration of James Morris

The objection to paragraph 3 is OVERRULED. The testimony is relevant foundation for the declarant's later testimony. The testimony contains no improper legal conclusions or opinions.

The objection to paragraph 4 is OVERRULED. The testimony is relevant foundation for the declarant's later testimony. The testimony contains no improper legal conclusions or opinions. The testimony is a description of the subject matter of conversations, not a specific out-of-court statement, and thus is not hearsay. (See Hair v. McGuire (1961) 188 Cal.App.2d 348, 357; Browne v. Turner Construction Co. (2005) 127 Cal.App.4th 1334, 1348-1349.)

The objection to paragraph 5 is OVERRULED. The testimony is relevant foundation for the declarant's later testimony. The court will consider the evidence only for proper purposes.

The objection to paragraph 6 is OVERRULED. The testimony is relevant foundation for the declarant's later testimony. The court will consider the evidence only for proper purposes.

The objection to paragraph 7 is OVERRULED. The testimony is relevant foundation for the declarant's later testimony. The court will consider the evidence only for proper purposes.

The objection to paragraph 8 is OVERRULED. The testimony is relevant to the issues presented in one of the consolidated petitions, so it is relevant to both. The testimony appears to be intended as a statement of the declarant's own understanding and not a legal conclusion or expert opinion. The court will only consider the evidence for proper purposes.

The objection to paragraph 9 is OVERRULED. The testimony is relevant to the issues presented in one of the consolidated petitions, so it is relevant to both. The testimony appears to be intended as a statement of the declarant's own understanding and not a legal conclusion or expert opinion. The court will only consider the evidence for proper purposes.

The objection to paragraph 11 is OVERRULED. The testimony is relevant to the issues presented in one of the consolidated petitions, so it is relevant to both. The testimony appears to be intended as a statement of the declarant's own understanding and not a legal conclusion or expert opinion. The court will only consider the evidence for proper purposes.

The objection to paragraph 12 is OVERRULED. The testimony is relevant to the issues presented in one of the consolidated petitions, so it is relevant to both. The testimony appears to be intended as a statement of the declarant's own understanding and not a legal conclusion or expert opinion. The court will only consider the evidence for proper purposes.

The objection to paragraph 14 is OVERRULED. The testimony is relevant to the issues presented in one of the consolidated petitions, so it is relevant to both. The testimony appears to be intended as a statement of the declarant's own understanding and not a legal conclusion or expert opinion. The court will only consider the evidence for proper purposes.

The objection to paragraph 15 is OVERRULED. The testimony is relevant to the issues presented in one of the consolidated petitions, so it is relevant to both. The testimony appears to be intended as a statement of the declarant's own understanding and not a legal conclusion or expert opinion. The court will only consider the evidence for proper purposes.

The objection to paragraph 24 is OVERRULED. The testimony appears to be intended as a statement of the declarant's own understanding and not a legal conclusion or expert opinion. The court will only consider the evidence for proper purposes.

The objection to paragraph 27 is OVERRULED. The testimony appears to be intended as a statement of the declarant's own understanding and not a legal conclusion or expert opinion. The court will only consider the evidence for proper purposes.

The objection to paragraph 28 is OVERRULED. The testimony appears to be intended as a statement of the declarant's own understanding and not a legal conclusion or expert opinion. The court will only consider the evidence for proper purposes.

The objection to paragraph 29 is OVERRULED. The testimony appears to be intended as a statement of the declarant's own understanding and not a legal conclusion or expert opinion. The court will only consider the evidence for proper purposes.

The objection to paragraph 30 is OVERRULED. The testimony is relevant to the issues presented in one of the consolidated petitions, so it is relevant to both.

The objection to paragraph 33 is OVERRULED. The testimony is relevant to the issues presented in one of the consolidated petitions, so it is relevant to both.

Class B Directors' Right to Access Corporate Records

Section 1602 of the Corporations Code states that "every director shall have the absolute right at any reasonable time to inspect and copy all books, records and documents of every kind and to inspect the physical properties of the corporation of which such person is a director …" (Corp. Code § 1602.) The court in Havlicek v. Coast-to-Coast Analytical Services, Inc. (1995) 39 Cal.App.4th 1844 held that section 1602's "absolute right" language was subject to "just and proper" restrictions. The court posed a hypothetical situation in which a disgruntled director has unambiguously announced his intention to violate fiduciary duties by using inspection rights to steal trade secrets and customer lists in order to compete with the corporation, and reasoned that courts could limit access to corporate records in such a situation. (Id. at 1855-1856.) It should be noted, however, that no such evidence was presented to the trial court in Havlicek, and the Court of Appeal remanded for further consideration with instructions to allow access unless "necessary to prevent a tort against the corporation." (Id. at 1856.)

The court in Saline v. Superior Court (2002) 100 Cal.App.4th 909 dealt with a corporate dispute in which a director was accused of sharing confidential corporate information, publicly disparaging corporate management, possessing significant conflicts of interest, and generally breaching fiduciary obligations to the corporation. (Id. at 914.) Based on the evidence presented, the court held that there was no legal basis to limit access, or to require confidentiality. (Id. at 914-916.)

This case appears to be much closer to the facts of Saline than the hypothetical posed in Havlicek. In fact, the facts of this case appear to fall short of the misconduct alleged in Saline. Respondent has not presented any evidence that the Class B Directors or Cal Ida have breached any fiduciary duties in the past, or that they have expressed any intent to use information gained from inspection of corporate records for any improper purpose. On the contrary, the Class B Directors have repeatedly stated they will only use corporate information in their capacity as directors of CALAMCO. It also appears that Class B Directors have been privy to information in the past regarding areas or projects in which CALAMCO and Simplot are competitors, without any impropriety.

The mere specter of possible improper use of corporate information does not justify limiting access to, or speech regarding, corporate information. (Saline, supra, 100 Cal.App.4th at 916.) As the court stated in Saline, the corporation's remedy for such improper use of information—if it ever happens—is to sue the offending director for damages. (Id.)

Respondent's evidence does not show any impending harm to the corporation as a result of access to corporate records. At most, Respondent alleges an unrelated breach of fiduciary duties by not attending board meetings, similar to the conduct alleged in Saline. The court in Saline was careful to distinguish between general misconduct and misconduct related to access to corporation records, and that logic applies equally here.

Based on the evidence presented here, there is no legal basis to limit the Class B Directors' access to the "books, records, and documents of every kind" of CALAMCO. (Corp. Code § 1602.)

Attorney-Client Privilege

Neither party has provided any legal authority directly on point regarding how the attorney-client privilege applies in this case. Predictably, Petitioners claim they are entitled to all documents, and Respondents argue attorney-client and work product documents should not be disclosed. Respondent cites Titmas v. Superior Court (2001) 87 Cal.App.4th 738, which involved a shareholder derivative action. The court is aware of other cases in which courts did not allow inspection of attorney-client privileged documents where the parties were adverse to each other in litigation. (Tritek Telecom, Inc. v. Superior Court (2009) 169 Cal.App.4th 1385 [corporate director suing as a shareholder in derivative action was not entitled to inspection of privileged or work product documents under section 1602]; National Football League Properties, Inc. v. Superior Court (1998) 65 Cal.App.4th 100 [same].)

In Tritek, a dispute between two corporate directors ended in various lawsuits, including a shareholder's derivative action for return of investment and damages, a cross-complaint for damages for defrauding the corporation, and a petition for removal of one of the directors. (Id. at 1388-1389.) After the shareholder derivative suit was initiated,

one director filed a petition under Corporations Code section 1602 to allow inspection of corporate records, including all case files related to the shareholder action. (Id. at 1389.) The trial court granted the petition, but the Court of Appeal reversed, holding it was improper to allow access to privileged documents. Specifically, the court reasoned that directors are presumed to act in good faith, and the court defers to the business judgment of disinterested directors. (Id. at 1390.) By filing a shareholder derivative suit, the director in Tritek had become adverse to the corporation and stood to gain in his individual capacity from a win in the shareholder litigation. (Id. at 1391.) The court held he could not access privileged documents that were generated in defense of the shareholder suit. (Id. at 1391-1392.)

The result and reasoning of National Football League Properties is similar. In all three of these cases, the privileged documents at issue were documents created in response to the shareholder derivative action. Thus, the corporate director would have gained a direct and personal competitive advantage in the derivative litigation if inspection of corporate documents had been allowed.

In this case, the parties are not on opposite sides of a lawsuit in which a personal competitive advantage might be gained by access to corporate documents. The only litigation between the parties is these petitions, which concern the parties' rights and obligations as directors and shareholders, not personal actions for damages like Titmas, Tritek, and National Football League. Moreover, even assuming that the corporation holds the attorney/client privilege independent from its directors, CALAMCO has waived the attorney/client privilege as to any documents provided to the Class A Directors but not to the Class B Directors.

Therefore, the court orders that Class B Directors receive the same access to information and records as has been given and will be given to Class A Directors.

Cal Ida's Right to Access Corporate Records

Corporations Code section 1601 provides:

The accounting books, records, and minutes of proceedings of the shareholders and the board and committees of the board of any domestic corporation, and of any foreign corporation keeping any records in this state or having its principal executive office in this state, …shall be open to inspection at the corporation's principal office in this state … upon the written demand on the corporation of any shareholder or holder of a voting trust certificate at any reasonable time during usual business hours, for a purpose reasonably related to the holder's interests as a shareholder or as the holder of a voting trust certificate.

(Corp. Code § 1601(a)(1).) Here, Petitioners argue Cal Ida is entitled to access to documents and information regarding the UAN32 project. Respondent makes no specific argument regarding a shareholder's right of access under section 1602, but appears to lump Cal Ida's rights in with the Class B Directors' rights, arguing that they may be limited to protect the corporation from a tort.

However, it appears the reasoning of Havlicek should not apply to requests by shareholders. The reasoning of Havlicek is aimed at protecting the corporation from an imminent tort committed by a director, in light of section 1602's "absolute right" language. Section 1601 contains no such absolute right, and expressly limits access by shareholders to certain kinds of records, for certain purposes. Thus, the Havlicek court's concerns over an absolute inspection right do not apply to shareholder inspection rights, which are already limited by section 1601.

The parties cite no other cases regarding a shareholder's right of access, but the court is aware of another case addressing the topic. In Webster v. Bartlett Estate Co. (1917) 35 Cal.App.283, the court allowed a shareholder access to corporate records, which the shareholder sought to aid her litigation against the corporation. The court held that where the statute grants shareholders a right of inspection, the court will not inquire as to the motive behind the inspection. (Id. at 288.)

Here, Respondent has not shown any grounds for restricting Cal Ida's right to inspection as a shareholder. Furthermore, Respondent's arguments regarding attorney/client privilege do not apply to these documents. Unless

Respondent can show otherwise, it is difficult to see how "accounting books, records, and minutes of proceedings of the shareholders and the board and committees of the board" could fall under the attorney/client privilege.

Therefore, the court orders that Cal Ida be granted access to corporate records as set forth in section 1601, specifically including, but not limited to, minutes of proceedings of the board and committees of the board.

CALAMCO's Petition to Compel Attendance at Board Meetings

The burden is on the petitioner to establish good cause for writ relief. (Khan v .Los Angeles City Employees' Retirement System (2010) 187 Cal.App.4th 98, 106.) Here, CALAMCO has not provided any legal authority allowing the court to compel directors to attend a board meeting, other than the court's broad equitable powers. On the other hand, Respondents argue their decision not to attend a meeting where they will be asked to vote on an issue about which they are not well-informed is not purely ministerial, but rather involves some level of business judgment. Respondents have the better argument.

CALAMCO has also not presented any legal authority that allows the court to excuse the quorum requirement. Section 7515 applies to nonprofit mutual benefit corporations, and the legislative history cited by Respondents would seem to indicate the policy behind section 7515 is not applicable to the corporate director dispute in this case. There appear to be good reasons not to expand section 7515 to apply to this case. Moreover, the day-to-day business of CALAMCO appears to be getting done (apart from the UAN32 project), and the Class B Directors will be provided with the same information as the Class A Directors regarding the UAN32 project, thus removing their only claimed reason not to attend board meetings. Therefore, CALAMCO's petition is DENIED WITHOUT PREJUDICE to it being brought again in the future if the Class B Directors still refuse to attend meetings after they have received equal access to corporate information and records as described above.

The Class B Directors and Cal Ida shall prepare and serve an order in accordance with rule 3.1312 of the California Rules of Court.

FACTUAL AND PROCEDURAL BACKGROUNDThese two consolidated cases arise out of a dispute among the shareholders of CALAMCO, a California corporation with its principal place of business in Stockton. CALAMCO is a chemical fertilizer co-op formed between chemical suppliers and a group of farmers. CALAMCO has two classes of common stock, A and B, with equal voting rights. The farmers own Class A shares, and the chemical suppliers own Class B shares. Cal-Ida Chemical Company is a wholly owned subsidiary of Simplot and CALAMCO's largest single shareholder. Cal Ida owns 74% of the Class B stock (34% of the total common stock). CALAMCO's board consists of four Class A directors and three Class B directors. All of the Class B Directors are employees of Simplot.
In the past, Simplot was the exclusive supplier of UAN32, a nitrogen fertilizer, to CALAMCO and its members. In September of 2020, CALAMCO's CEO Dan Stone announced that CALAMCO would be entering the UAN32 market in the 2021 fiscal year, including building a storage facility and purchasing UAN32 from outside sources for resale. This would make them a competitor of Simplot, with both companies selling UAN32 in California.
Upon learning of the announcement, Cal Ida and the Class B Directors asked for more information regarding the UAN32 project, including meeting minutes and any corporate records or communications regarding the project. (Petition, § 22.) CALAMCO's counsel, at Mr. Stone's direction, refused to provide the documents, citing the competitive position between CALAMCO and Simplot. The parties negotiated a non-disclosure agreement that specified any information received by the Class B Directors would be used only in their capacity as Directors of CALAMCO and would not be disclosed to anyone who works for Simplot.
However, after the non-disclosure agreement was signed, CALAMCO added a condition to release of the corporate records. CALAMCO demanded that Class B Directors attend a Board meeting before the records would be released. It appears that the Class B Directors were worried that if they attended the meeting, the Class A directors would formally approve the UAN32 project at that meeting over their objection, and without their having had any opportunity to become informed or weigh in on the details contained in the corporate records.
The two sides have competing Petitions for Writ of Mandate. The Class B Directors and Cal Ida are seeking a ruling that CALAMCO must release corporate records regarding the UAN32 project. CALAMCO is seeking a ruling that the Class B Directors be required to attend a board meeting, or that the quorum requirement be suspended so the Class A Directors can proceed with the management of CALAMCO in their absence.

The cases are consolidated and both petitions are set for hearing on the same day.


Class B Directors and Cal IDA Writ-

Class B Directors want the same access to information and records as has been provided to Class A Directors. The Corporations Code provides the general rule that corporate directors have "absolute right" to access corporate records and information, and courts have carved out very narrow exceptions to that general rule that do not appear to exist here.

Class B Directors' Right to Access Corporate Records

Section 1602 of the Corporations Code states that "every director shall have the absolute right at any reasonable time to inspect and copy all books, records and documents of every kind and to inspect the physical properties of the corporation of which such person is a director …" (Corp. Code § 1602.) The court in Havlicek v. Coast-to-Coast Analytical Services, Inc. (1995) 39 Cal.App.4th 1844 held that section 1602's "absolute right" language was subject to "just and proper" restrictions. The court posed a hypothetical situation in which a disgruntled director has unambiguously announced his intention to violate fiduciary duties by using inspection rights to steal trade secrets and customer lists in order to compete with the corporation, and reasoned that courts could limit access to corporate records in such a situation. (Id. at 1855-1856.) It should be noted, however, that no such evidence was presented to the trial court in Havlicek, and the Court of Appeal remanded for further consideration with instructions to allow access unless "necessary to prevent a tort against the corporation." (Id. at 1856.)

The court in Saline v. Superior Court (2002) 100 Cal.App.4th 909 dealt with a corporate dispute in which a director was accused of sharing confidential corporate information, publicly disparaging corporate management, possessing significant conflicts of interest, and generally breaching fiduciary obligations to the corporation. (Id. at 914.) Based on the evidence presented, the court held that there was no legal basis to limit access, or to require confidentiality. (Id. at 914-916.)

This case appears to be much closer to the facts of Saline than the hypothetical posed in Havlicek. In fact, the facts of this case appear to fall short of the misconduct alleged in Saline. Respondent has not presented any evidence that the Class B Directors or Cal Ida have breached any fiduciary duties in the past, or that they have expressed any intent to use information gained from inspection of corporate records for any improper purpose. On the contrary, the Class B Directors have repeatedly stated they will only use corporate information in their capacity as directors of CALAMCO. It also appears that Class B Directors have been privy to information in the past regarding areas or projects in which CALAMCO and Simplot are competitors, without any impropriety.

The mere specter of possible improper use of corporate information does not justify limiting access to, or speech regarding, corporate information. (Saline, supra, 100 Cal.App.4th at 916.) As the court stated in Saline, the corporation's remedy for such improper use of information—if it ever happens—is to sue the offending director for damages. (Id.)

Respondent's evidence does not show any impending harm to the corporation as a result of access to corporate records. At most, Respondent alleges an unrelated breach of fiduciary duties by not attending board meetings, similar to the conduct alleged in Saline. The court in Saline was careful to distinguish between general misconduct and misconduct related to access to corporation records, and that logic applies equally here.

Based on the evidence presented here, there is no legal basis to limit the Class B Directors' access to the "books, records, and documents of every kind" of CALAMCO. (Corp. Code § 1602.)


Cal Ida's Right to Access Corporate Records

Corporations Code section 1601 provides:

The accounting books, records, and minutes of proceedings of the shareholders and the board and committees of the board of any domestic corporation, and of any foreign corporation keeping any records in this state or having its principal executive office in this state, …shall be open to inspection at the corporation's principal office in this state … upon the written demand on the corporation of any shareholder or holder of a voting trust certificate at any reasonable time during usual business hours, for a purpose reasonably related to the holder's interests as a shareholder or as the holder of a voting trust certificate.

(Corp. Code § 1601(a)(1).) Here, Petitioners argue Cal Ida is entitled to access to documents and information regarding the UAN32 project. Respondent makes no specific argument regarding a shareholder's right of access

under section 1602, but appears to lump Cal Ida's rights in with the Class B Directors' rights, arguing that they may be limited to protect the corporation from a tort.

The reasoning of Havlicek applies to requests by shareholders. The reasoning of Havlicek is aimed at protecting the corporation from an imminent tort committed by a director, in light of section 1602's "absolute right" language. Section 1601 contains no such absolute right, and expressly limits access by shareholders to certain kinds of records, for certain purposes. It stands to reason that the Havlicek court's concerns over an absolute inspection right do not apply to shareholder inspection rights, which are already limited by section 1601.

Respondent has not shown any grounds for restricting Cal Ida's right to inspection as a shareholder. Cal Ida should be granted access to corporate records, specifically including, but not limited to, minutes of proceedings of the board and committees of the board.

Respondent's arguments regarding attorney/client privilege do not apply to these documents. "Accounting books, records, and minutes of proceedings of the shareholders and the board and committees of the board" are not privileged.

CALAMCO Writ-

The burden is on the petitioner to establish good cause for writ relief. (Khan v .Los Angeles City Employees' Retirement System (2010) 187 Cal.App.4th 98, 106.) Here, CALAMCO has not provided any legal authority allowing the court to compel directors to attend a board meeting, other than the court's broad equitable powers. On the other hand, Respondents argue their decision not to attend a meeting where they will be asked to vote on an issue about which they are not well-informed is not purely ministerial, but rather involves some level of business judgment. Respondents have the better argument.

CALAMCO has also not presented any legal authority that allows the court to excuse the quorum requirement. Section 7515 applies to nonprofit mutual benefit corporations, and the legislative history cited by Respondents would seem to indicate the policy behind section 7515 is not applicable to the corporate director dispute in this case. There are good reasons not to expand section 7515 to apply to this case.

Moreover, given the fact that the day-to-day business of CALAMCO appears to be getting done (apart from the UAN32 project), and given the fact that the Class B Directors will be provided with the same information as the Class A Directors regarding the UAN32 project, it is reasonable to deny this petition without prejudice to it being brought again in the future if the Class B Directors are still obstructing the UAN32 project after they have received the same information the Class A Directors have received.

CONCLUSION

Since the Court is ruling that the UAN32 project information provided to Class A Directors must be given to the Class B Directors, that will alleviate Class B Directors' expressed reason for not attending the October board meeting, and there should not be any further obstacle to prevent them from attending and participating in all future board meetings. However, in the event the Class B Directors continue to miss board meetings after having been provided the UAN32 project information previously withheld, then CALAMCO is free to once again pursue a Writ in this court, assuming such action is properly authorized.

NOTE: Court will be limiting oral argument, in the event such is requested, to 15 minutes per side. If there is argument, it will be heard on the Court's Bridge line, as noted at the beginning of this ruling.

Barbara A. Kronlund

Petition for Writ of Mandate filed by Class B Directors and Cal Ida chemical Company is Granted.

Petition for Writ of Mandate filed by Calamco is Denied without prejudice.

Pursuant to California Rules of Court, Rule 3.1312 (a) and Code of Civil Procedure section 1019.5(a), no further written order is necessary. The minute order adopting this tentative ruling will serve as the order of the court and service by the clerk will constitute notice of the order.

Counsel for Cal Ida Chemical Company shall submit the Writ directly to the courtroom clerk via email.

The Court having conducted a Case Management Conference, now orders:

CMC: Further Case Management Conference is scheduled at 8:45 AM on July 7, 2021 in Department 10D.

Court requests that counsel meet and confer prior to the next scheduled hearing to try and work out attorney fees. If counsel is not able to come to an agreement, a noticed motion must be filed.

Notice to be given by counsel for Cal Ids Chemical Company.

# EXHIBIT 6

app as to form
MY

1   Hal Michael Clyde, Bar No. 302473
    MClyde@perkinscoie.com
2   PERKINS COIE LLP
    3150 Porter Drive
3   Palo Alto, CA 94304
    Phone: 650.838.4300
4   Fax: 650.838.4350

5   Donald J. Kula, Bar No. 144342
    DKula@perkinscoie.com
6   PERKINS COIE LLP
    1888 Century Park East, Suite 1700
7   Los Angeles, CA 90067-1721
    Phone: 310.788.9900
8   Fax: 310.788.3399

9   Adam Anthony Ramirez, Bar No. 251064
    ARamirez@hemlaw.com
10  HAKEEM ELLIS & MARENGO
    3414 Brookside Rd., Ste 100
11  Stockton, CA 95219
    Phone Number: 209.474.2800
12  Fax Number: 209.474.3654

13  Attorneys for Richard Sunderland, G. Rey
    Reinhardt, Chris Shelden, Cal Ida Chemical
14  Company

15              SUPERIOR COURT OF THE STATE OF CALIFORNIA

16                        COUNTY OF SAN JOAQUIN

17

18  Cal Ida Chemical Company, a California       No. STK-CV-UWM-2020-8589
19  corporation; Richard Sunderland, an
    individual; G. Rey Reinhardt, an             (Consolidated with Case No. STK-CV-UWM-
20  individual; and Chris Shelden, an            2020-8980)
    individual;
21                                               [PROPOSED] PEREMPTORY WRIT OF
                                                 MANDATE
22                              Petitioners,
                                                 Action Filed: October 9, 2020
23        v.                                     Trial Date: None Set
                                                 Judge: Honorable Barbara A. Kronlund
24  Dan Stone, an individual, in his capacity as  Dept.: 10D
    Chief Executive Officer of CALAMCO
25  f/k/a California Ammonia Co., a California
    corporation
26
                                Respondent.
27

28

Filed _____ MAR 15 2021
BRANDON E. RILEY, CLERK
By _____
            DEPUTY

**To: Dan Stone and the management of CALAMCO**

An action for a writ of mandate pursuant to California Corporations Code §§ 1600 et seq. and California Code of Civil Procedure §1085 to compel Dan Stone in his capacity as Chief Executive Officer of CALAMCO ("Respondent") to provide documents requested on August 19, 2020, (the "Requests") by its shareholder, Cal Ida Chemical Company and three members of its Board of Directors, Richard Sunderland, G. Rey Reinhardt, and Chris Sheldon, collectively "Petitioners" was commenced October 9, 2020.

An alternative writ of mandate issued on October 23, 2020, commanding Respondent to make available for inspection and copying by Petitioners and their agents all documents responsive to the Requests, including the documents identified in paragraphs 1 and 2 below, immediately after Respondent's receipt of that alternative writ, or to appear before this Court on November 12, 2020, to show cause why Respondent have not made available the demanded items.

The November 12, 2020, hearing was continued on the Court's motion to March 5, 2021, at 9:00 a.m. No party requested the opportunity to present evidence at the hearing, and on March 3, 2021, the Court issued its Tentative Ruling granting this Peremptory Writ of Mandate.

No party contested the Tentative Ruling, which has become the final ruling of this Court.

NOW THEREFORE, LET A PEREMPTORY WRIT OF MANDATE ISSUE, COMMANDING THE FOLLOWING:

1.     To the extent not already produced, on or before March 31, 2021, or such other date as may be agreed by the parties or ordered by this Court, Respondent shall make available to Petitioners for inspection and copying at the headquarters of CALAMCO, or such other place as shall be agreed by the parties, the following documents in hard copy and electronic form requested by Petitioners on August 19, 2020:

      a.  The books, records, and minutes (draft and final) of proceedings of the shareholders, the Board, and committees of the Board from January 1, 2018 to date;

      b.  All books and records referring or in any way relating to the "UAN32 project" or "discussions since at least the 2017 Strategic Planning meeting regarding

1    CALAMCO's entry into the UAH32 market" referred to in James M. Morris'
     letter to Steven Ducommun dated August 17, 2020, including (but not limited to):

2
     i.    all communications among management, with Class A shareholders, the four
3          members of the Board elected by the Class A shareholders, or any third-party
           referring or in any way relating to the UAN32 project or those discussions;
4
     ii.   all analyses of any market for UAN32; and
5
     iii.  all analyses of the parties with whom CALAMCO expects to compete if it
6          proceeds with the UAN32 project.

7    c.  All books and records relating to any competition between "CALAMCO and
         Simplot" and CALAMCO and any other shareholder, as referred to in your
8        August 17 letter.

9    d.  The books and records of CALAMCO as they relate to the internal affairs of
         CALAMCO for the last four fiscal years.
10

11   2.   Respondent's production pursuant to paragraph 1 shall include, but is not limited

12   to, the following documents that Respondent identified as responsive to the Requests but withheld

13   from Petitioners:

14   a.  **Legal counsel correspondence**--"[c]orrespondence between Downey Brand LLP
         and Dan Stone relating to the current issues between CALAMCO and Simplot;"
15
     b.  **Director Documents**;
16
         i.    **June Project Summary - June 2020**--"a one-page financial analysis prepared
17             by Mr. Stone for the A Directors to which was attached the document
               identified as Dealers & Contact Info;"
18
         ii.   **Marketing Summary - June 2020**--"a single page analysis performed by Mr.
19             Stone;"

20       iii.  **Dealers & Contact Info - June 2020**; and

21       iv.   **Miscellaneous emails**.

22   c.  **Internal Dealer Analysis**--is comprised of emails from CALAMCO's marketing
         representatives to Mr. Stone;"
23
     d.  **Internal Financial Analysis and Cash Flow**;
24
     e.  **Internal Pricing Scenario**;
25
     f.  **NH3 Customer Info - Confidential**--"files that Mr. Stone has compiled
26       regarding potential and/or current customers for NH3;" and

27   g.  "Emails and notes drafted by Mr. Stone regarding the UAN32 project relating to
         supply and marketing issues. These are included in the general descriptions in the
28       list of documents withheld."

---

No. STK-CV-UWM-2020-8589          -3-          [Proposed] Peremptory Writ of Mandate

1        3.      This Court shall retain jurisdiction over Respondent until the Court has determined

2    that Respondent has complied with this Peremptory Writ of Mandate.

3

4    March 15, 2021

5

6                                                              _____

7                                                              Honorable Barbara A. Kronlund
                                                               Judge of the Superior Court
8

9

10

11   Approved as to form:

12   By: Hal Michael Clyde           Date: 12 March 2021

13   ─────────────────────
     Hal Michael Clyde
14   For: Cal Ida Chemical Company, G.
            Richard Sunderland, Rey
15          Reinhardt, and Chris Shelden

16

17   By: _____      Date: 3.12.21

18   ─────────────────────
     Clement L. Glynn
19   For: Daniel Stone

20

21

22

23

24

25

26

27

28
─────────────────────────────────────────────────────────
No. STK-CV-UWM-2020-8589              -4-          [Proposed] Peremptory Writ of Mandate