1

2

3

4

5

6

7

8                     UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    CALAMCO,                                    No. 2:21-cv-01201-KJM-CSK

12                    Plaintiff,                   ORDER

13          v.

14    J.R. Simplot Company, et al.,

15                    Defendants.

16    _____

17     And related counterclaims.

18

19

20          This lawsuit arises from an agreement between plaintiff Calamco[1] and defendant J.R.

21    Simplot Company.  Their disputes relate mostly to Calamco's efforts to compete with Simplot in

22    the market for a fertilizer known as UAN 32.[2]  The matter is before the court on Calamco's

---

[1] The parties and other documents in the record refer to the plaintiff inconsistently as "Calamco," "CALAMCO" and "CALAMCO." *See, e.g.*, Am. Countercl., ECF No. 80; Handling & Storage Agreement (2011), Friedenberg Decl. Ex. 10, ECF No. 142-4; 2009 Annual Report, Baltzer Decl. Ex. 2, ECF No. 147-4.  The court has used ordinary initial capitalization here in the interest of better readability.

[2] According to a document that is publicly available on Simplot's website, "UAN" refers to a solution of urea and ammonium nitrate, and "32" refers to the amount of nitrogen within that solution by weight, i.e., 32 percent.  *See* J.R. Simplot Company, "UAN-32 Urea Ammonium

1

1    motion for summary judgment of Simplot's counterclaims.  As discussed in this order, the motion

2    is **granted in part and denied in part**.  In short, the court cannot determine as a matter of law on

3    the current record whether the parties' agreement precludes Calamco from competing with

4    Simplot; nor can the court determine as a matter of law whether Calamco breached its implied

5    covenant to deal fairly and in good faith.  But Simplot has not cited evidence that could permit it

6    to prevail on its other claims at trial.

7    **I.    UNDISPUTED FACTS**

8           The relevant facts are almost entirely undisputed.  In the few places where a genuine

9    dispute would need to be resolved at trial, the court has assumed a factfinder would resolve that

10    conflict in favor of Simplot, as it must at this stage.  *See Matsushita Elec. Indus. Co. v. Zenith*

11    *Radio Corp.*, 475 U.S. 574, 587–88 (1986).

12           Calamco is a cooperative originally formed in the 1950s.  *See* Baltzer Decl. Exs. 1 & 3,

13    ECF No. 147-4; Stone Decl. ¶¶ 4–5, ECF No. 142-2.  Its purpose, according to its current

14    president and CEO, Dan Stone, "is to manufacture, acquire and sell fertilizers to its own

15    shareholder-patrons."  Stone Decl. ¶ 4.  Calamco operates as a non-profit in that it pays out "the

16    excess of the selling price over the cost of products sold to all shareholder-patrons."  Bylaws Art.

17    VII, § 4.A (Feb. 20, 2020), Friedenberg Decl. Ex. 52, ECF No. 142-4.  In more concrete terms, if

18    Calamco sold a particular product for $1.2 million and spent $1.0 million producing that product,

19    then Calamco would return $200,000 to its shareholder patrons.  The math is slightly more

20    complicated when Calamco sells an intermediate component or ingredient to another

21    manufacturer, who then uses that ingredient to create a product of its own.  In that situation,

22    Calamco would pay shareholders a fraction of the purchase price based on the amount of the

23    Calamco ingredient within the finished product.  *See* Bylaws Art. VII, § 4.A; Stone Decl. ¶ 10.

24    Calamco and Simplot refer to these payments interchangeably as "refunds" or "patronage" or

25    "patronage refunds."  *See, e.g.*, Mot. at 1, ECF No. 142; Opp'n at 2, ECF No. 147.  The court

26    does the same in this order.

---

Nitrate Solution 32-0-0," https://www.simplot.com/wholesale-crop-nutrition/product/11040
(visited July 15, 2025).

Calamco has two types of shares: class A shares, owned mostly by farmers, and class B shares, owned mostly by fertilizer dealers. Stone Decl. ¶ 5; Sunderland Decl. ¶ 10, ECF No. 147-3. These shareholders elect the members of Calamco's seven-member board of directors. Stone Decl. ¶ 6. The class A shareholders elect four directors, and the class B shareholders elect three. *Id.* Just one entity—the Cal Ida Chemical Company, a wholly owned Simplot subsidiary—owns most of the outstanding class B shares, so Simplot has appointed its own employees to the three class B seats for many years. *See* Sunderland Decl. ¶¶ 11, 13; Stone Decl. ¶ 5.

Calamco and Simplot have a longstanding but sometimes competitive relationship. Simplot has been Calamco's largest customer of anhydrous ammonia, a chemical that can be used in fertilizers, since Stone became CEO about seven years ago, and Simplot was the single largest purchaser of Calamco ammonia for many years before that. Stone Decl. ¶ 7. Simplot resells some of the ammonia it purchases, and it uses some to manufacture other products. *Id.* ¶ 8. Calamco and Simplot can, therefore, find themselves competing for the same customers. *Id.* That relationship can put the class B directors—those appointed by Simplot—in something of an awkward spot. They are not only members of the Calamco board of directors with duties to the cooperative, but also employees of its competitor. *See* Sunderland Dec. ¶¶ 15–17. One of these board members, Richard Sunderland, described this "unique" situation by metaphor: when he and other class B directors participate in Calamco board meetings and discussions, they put on a "Calamco hat," meaning they "strive to make decisions that are in the best interest of Calamco and its shareholders, even if the proposed course of action would not necessarily benefit Simplot." *Id.* ¶ 15.

This lawsuit is about a series of agreements Calamco and Simplot began negotiating in the late 1990s. Calamco wanted to begin supplying its shareholders with UAN 32. *See* Powell Dep. at 29, 43, Ivy Decl. Ex. B, ECF No. 148-1; Gray Dep. at 26–29, Ivy Decl. Ex. A, ECF No. 148-1. Calamco's CEO at the time, Bob Smith, now deceased, believed UAN 32 would eventually replace the ammonia Calamco was then offering. Gray Dep. at 27. Smith came to Steve Gray, a Simplot employee and class B shareholder, to propose a deal. *See id.* According to Gray, Smith told him he wanted to build a new UAN 32 tank next to a tank Calamco already was operating at

1  the Port of Stockton, which the cooperative would use to store imported UAN 32. *Id.* Under

2  Smith's proposal, Calamco would "handle the operations or receiving and loading," while

3  Simplot would procure the UAN 32. *Id.* It would be, in Gray's words, "a mutually exclusive

4  deal." *Id.* at 34. "That is to say, all that UAN going through the terminal was sold by Simplot.

5  Calamco is not getting into the business of selling UAN . . . . There was never any suggestion

6  that Calamco was going to sell anything." *Id.* at 34–35.

7      Gray also remembers Smith explaining how he wanted to persuade Calamco's class A

8  shareholders "he was working for them and trying to get some sort of access to UAN for them by

9  way of Simplot." *Id.* at 27. To that end, Smith said he would pay patronage on the imported

10  UAN 32 as a "hook" to show it was a "Calamco product." *Id.* at 29. "My take," Gray testified,

11  "was that it was to enable customers to order through Calamco and help keep Calamco viable,

12  which Bob worked for." *Id.* at 32. "It made sense to me," Gray testified, "as long as it penciled

13  out." *Id.* at 27.

14      Other witnesses from both the Simplot and Calamco sides of the table described the deal

15  similarly. For example, Barry Powell, Calamco's former Vice President and CFO, testified in his

16  deposition about how the mutually exclusive nature of the proposal dovetailed with the patronage

17  payments Calamco made on sales of UAN 32. As he understood it, Calamco and Simplot agreed

18  Simplot would supply all the UAN 32 Calamco's shareholders needed, and Calamco agreed it

19  would not buy from another supplier or compete with Simplot in the UAN 32 market. Powell

20  Dep. at 56–57, Ivy Decl. Ex. B, ECF No. 148-1. Although Calamco's shareholders might choose

21  to buy their UAN 32 from someone else, "as between Calamco and Simplot, the intent was

22  Simplot would be the exclusive provider of the shareholders of UAN32." *Id.* at 57. The

23  patronage payments would also serve as an "incentive," a discount of sorts, to persuade

24  Calamco's shareholders to buy from Simplot. *Id.*

25      Brad Baltzer, a former Simplot executive and class B director, testified similarly. "Our

26  understanding of the agreement," he said, "was 100 percent we source and market exclusively

27  [UAN 32] out of the Stockton terminal and that Calamco was to warehouse, load trucks, provide

28  the terminal aspect, state of the art, for shareholder pick up of product. That was it. That was it.

1   Exclusively." Baltzer Dep. at 108, Friedenberg Decl. Ex. 206, ECF No. 142-5. "They're our

2   partners," he said, "why would we compete with each other? That was so far out of the realm of

3   our relationship. We weren't thinking that way." *Id.* He also agreed the patronage payments

4   were "essential" to Simplot's ability to import UAN 32. *Id.* at 90–91. They were "critical as an

5   incentive for the dealers not to buy from Agrium or not to buy from Yara," both potential

6   competitors; "buy from Calamco. You'll get coverage." *Id.* at 92.

7       For the next several years, Calamco and Simplot operated accordingly: Calamco built and

8   operated a UAN 32 tank at the Port of Stockton, Simplot supplied UAN 32 to Calamco's

9   shareholders, Calamco did not compete with Simplot in UAN 32 sales, and Calamco paid

10  patronage on shareholders' purchases. *See* Stone Dep. at 162–63, Ivy Decl. Ex. F, ECF No. 148-

11  1; Inderbitzen Dep. at 81, Ivy Decl. Ex. G, ECF No. 148-1. Even to this day, Calamco has never

12  sold UAN 32 to its shareholders in competition with Simplot. *See* Stone Decl. ¶ 17.

13      But the text of the written agreement itself, signed in 2001, does not include any express

14  prohibition unambiguously barring Calamco from selling UAN 32 to its shareholders. Nor does it

15  expressly require Calamco to pay patronage on sales of Simplot UAN 32.

16      That agreement, the "Handling and Storage Agreement" or "HSA," begins with three

17  recitals: (1) Simplot would bring "off-shore fertilizer solutions" to the United States, while

18  Calamco wanted "to provide the off-loading and storage facilities"; (2) Calamco agreed to

19  construct the necessary facilities; and (3) in exchange for Calamco's promise to operate facilities

20  capable of handling a specific throughput of UAN 32 for Simplot's exclusive benefit, Simplot

21  promised to take at least 100,000 short tons through the facility per year. 2001 HSA at 1,

22  Friedenberg Decl. Ex. 2, ECF No. 142-4. The HSA details the parties' various obligations in the

23  sections that follow these recitals. For example, the first section discusses the parties' obligations

24  for delivery and handling. *See id.* § 1. It includes a subsection granting Simplot exclusive use of

25  the newly constructed facilities. *Id.* § 1(e). In other sections, Simplot agreed to take the at least

26  100,000 short tons of UAN 32 through the facilities each year, *id.* § 4, and it agreed to pay

27  Calamco to handle and store that UAN 32 at specific rates, *id.* § 9.

In effect, the HSA thus allocated two risks to Simplot.  The first is what Simplot now describes as a "supply risk."  Opp'n at 3.  If Simplot did not supply the entire 100,000-short-ton quantity of UAN 32 in a given year, it would still be obligated to pay the predetermined handling and storage fee based on a volume of 100,000 short tons.  Second, if Simplot did secure the 100,000-short-ton minimum supply, but it could not find buyers among Calamco's shareholders for that entire volume, it would need to find buyers elsewhere, or at least remove the unsold UAN 32 and find storage elsewhere, lest it fall short of its obligation to "take" the entire 100,000 short tons from the newly constructed tank.  Simplot describes this second risk as a "market risk."  *Id.*

Other provisions in the 2001 HSA include Calamco's representation and warranty of its expertise, *id.* § 2; sections on demurrage, shrinkage, title and inventories, *id.* §§ 3, 5–7; sections about billing, taxes, and insurance, *id.* §§ 10–12; and provisions related to the resolution of any disputes that may arise, *see id.* §§ 14, 18, 19, 23; among other matters.  The HSA's termination date was in 2011, but Simplot had up to six consecutive five-year options to extend the agreement.  *Id.* § 8.  The agreement also includes an integration clause.  *Id.* § 20.  Finally, the 2001 HSA specifies it "may be amended only by a written instrument signed by all of the parties," *id.* § 22, and it similarly requires all waivers to be written, *id.* § 24.

The relationship between Calamco and Simplot has changed in the nearly twenty-five years since they signed their original HSA.  Some developments were discrete and contractual.  For one, in 2010, Calamco, Simplot and Cal Ida signed a "Business Alliance and Cooperative Governance Agreement" or "BACGA," Friedenberg Decl. Ex. 8, ECF No. 142-4, which one witness described as an effort to "clean this thing up . . . just kind of a refresher," Baltzer Dep. at 154.  By its terms, this agreement "terminated and replaced" all contracts between Calamco and Simplot except for those listed in an exhibit.  BACGA § 1.  The 2001 HSA is listed in the exhibit, so it remained in effect.  *See* BACGA Ex. 1 ¶ 1.

Another contractual development took place in 2011, when Calamco and Simplot amended the 2001 contract.  *See* Handling and Storage Agreement (2011), Friedenberg Decl. Ex. 10, ECF No. 142-4.  The amended agreement again begins with three recitals.  The first is the

most relevant for the pending motion.  It cites the 2001 HSA and explains the parties want their

original "arrangement" to continue:

> A) In March 2001, Calamco and Simplot partnered together to
> address concerns over potential. declines in the application of
> ammonia within California agriculture. In order to maintain
> Calamco's ability to supply its membership with nitrogen fertilizer,
> Simplot and Calamco reached agreement for Simplot to bring off-
> shore fertilizer UAN 32 solutions ("Product") to the Western U.S.
> market, with Calamco providing to Simplot the off-loading and
> storage facilities, together with handling activities to accommodate
> such Product. The Parties wish for this arrangement to continue, and
> Simplot now desires to increase the volume of imports of Product
> and Calamco desires to expand its storage facilities with additional
> tankage ("New Tank") to support this growth.

*Id.* at 1.  The second and third recitals describe the parties' purposes and the basics of their

agreement; they parallel the recitals in the parties' original agreement and are set out in full in the

footnote below for reference.[3]

---

[3] Recital B relates to the construction of a new tank.  *See id.* ("Calamco agrees, at its sole cost, to locate the New Tank at or adjacent to its existing storage facilities at the Port of Stockton and will use reasonable efforts to have the New Tank ready to receive and load-out Product by approximately January 1, 2012. Simplot will have the right to review design and construction plans for the New Tank. The existing off-loading and storage facilities and the New Tank (collectively, 'Facilities') shall be used in conjunction with the off-loading and handling activities to accomplish this mutual goal.").

Recital C gives an overview of the parties' obligations.  *See id.* at 1–2 ("Calamco and Simplot enter this Handling and Storage Agreement ('Agreement') to supersede said March 2001 agreement, and to set forth the terms and conditions under which both parties will work together to accomplish their interdependent mutual goals. Integral to this Agreement are the obligations that (1) Calamco will construct the New Tank of Thirty Thousand (30,000) short tons, and maintain and operate such Facilities as are capable of receiving and storing Seventy Thousand (70,000) short tons of liquid Product; (2) Simplot, subject to the provisions herein, shall take from the Facilities each contract year of this Agreement, not less than One Hundred Thousand (100,000) short tons of Product (the 'Minimum Commitment'); and (3) so long as Simplot is in compliance with the provisions of this Agreement and uses reasonable good faith efforts to meet the Product volume requirements of Calamco shareholders, Calamco will operate the Facilities for the exclusive use of Simplot. For purposes of this Agreement, 'meeting the Product volume requirements of Calamco shareholders' means fulfilling market orders placed by identified Calamco shareholders at Simplot's then applicable prices, contract/ordering requirements, delivery schedules and Terms and Conditions of Sale. In the event Calamco expresses an interest to use a portion of the Facilities (e.g. the load-out equipment) for distribution of a different product from a new tank that might be constructed in the future, Calamco must first obtain the consent of Simplot, which will not be unreasonably withheld so long as such use does not have

1    According to Baltzer, the 2011 HSA was a "carryover" of the original, which he thought

2    "was working very well." Baltzer Dep. at 181. There "was just an issue over volumes and

3    additional tankage." *Id.* Like the original, the 2011 HSA also includes provisions on delivery,

4    handling, quantity and throughput rates. *See also id.* §§ 1, 4, 9. And also like the original, the

5    2011 HSA includes an integration clause, *id.* § 20, provides it can be "amended only by a written

6    instrument signed by all of the parties," *id.* § 22, and includes neither an express prohibition

7    barring Calamco from selling UAN 32 to its shareholders nor any express provisions requiring

8    Calamco to pay patronage for any of its shareholders' UAN 32 purchases.

9    Despite these amendments and the new tank, Calamco's management began searching for

10   other potential sources of UAN 32. At first, these efforts appear to have been met with no

11   resistance or concerns among the class B directors, i.e., those affiliated with Simplot. Minutes

12   from a board meeting in 2013, for example, record a discussion about a "Northern Plains

13   Nitrogen project." Calamco Bd. Mtg. Mins. at 2 (Aug. 6–7, 2013), Friedenberg Decl. Ex. 11,

14   ECF No. 142-4. According to those minutes, Calamco was "currently looking at" that project "as

15   a potential investment and supply." *Id.* A plant had not been constructed, but could eventually

16   supply several thousand short tons of "ammonia, urea, UAN28 and UAN32." *Id.* After a

17   discussion, the board agreed the project probably would not work for Calamco, citing "the long-

18   term swap and the distance required to ship the product to California." *Id.*

19   Another potential investment came up about two years later, in 2015, and again the

20   evidence shows no signs of protest or concerns among the class B directors. *See* Calamco Bd.

21   Mtg. Mins. at 5 (June 17, 2015), Friedenberg Decl. Ex. 25, ECF No. 142-4. According to the

22   minutes of a board meeting that year, Calamco had received information from the operator of a

23   terminal in West Sacramento, California, which produced UAN 32, among other products. *See*

24   *id.*; *see also* Baltzer Dep. at 188–89; Stone Decl. ¶ 13. Calamco had a chance to make a bid to

25   buy the terminal. *See* Calamco Bd. Mtg. Mins. at 5 (June 17, 2015). Dan Stone, who at the time

---

the effect of: i) restricting Simplot's import/intake or distribution of Product; ii) interfering with
Calamco's ability to provide services under this Agreement; or iii) creating a material detriment
to Simplot.").

1   was Calamco's CFO rather than its CEO, recommended the board approve a specific proposed

2   bid.  *Id.*  After a discussion of potential environmental liabilities related to the purchase, the board

3   approved a lower bid instead.  *Id.*  The board also gave Calamco's CEO its authorization to hire

4   an environmental consultant.  *Id.*  None of the class B directors objected or raised any concerns

5   about Calamco's purchasing a facility that could produce UAN 32.  *See id.*  If anything, the

6   meeting minutes suggest Simplot and Calamco anticipated they would continue cooperating.

7   Baltzer offered Simplot's assistance "with plant and equipment evaluations" in connection with

8   the West Sacramento Plant.  *Id.* at 6.  But in the end, Calamco's bid for the terminal was not

9   accepted.  *See* Stone Decl. ¶ 14.

10      The first marker of possible tensions—at least on the record before the court—came in

11   2016.  In a board meeting that year, Calamco's CEO "led a discussion regarding a potential

12   decrease in the current patronage coverage of UAN32."  Calamco Bd. Mtg. Mins. at 2 (June 16,

13   2016), Friedenberg Decl. Ex. 29, ECF No. 142-4.  At the time, Calamco was paying patronage of

14   nineteen percent, which was based on a calculation of the amount of ammonia within the finished

15   product.  *See* Stone Decl. ¶ 10.  Dan Stone, then still the CFO, told the board Simplot's UAN 32

16   was imported, which meant no Calamco-produced ammonia had been used in its creation.  *Id.*

17   Because Calamco had not supplied the ammonia within the UAN 32, it had not earned any

18   revenue on the ammonia within it.  *See id.*  In Stone's assessment, this meant Calamco was

19   effectively "subsidizing" Simplot's ammonia sales with profits earned on other products.  *Id.*  The

20   board recognized a reduction in the patronage refund "could potentially affect volume moved

21   through the terminal," and it could have an "effect on the value of shares purchased by

22   shareholders who bought stock based on the UAN32 use."  *Id.*  As an alternative to a decreasing

23   refund, Stone suggested Simplot "could increase the terminaling rate paid to Calamco in order to

24   offset the subsidy."  *Id.*  The board ultimately voted to reduce the refund from nineteen to thirteen

25   percent, with further cuts down to seven percent to be considered again the next year.  *See id.* at 3.

26   Two class B directors were present at the meeting.  *See id.* at 1.  They both abstained from the

27   vote.  *See id.* at 3; *see also* Calamco Bd. Mtg. Mins. at 2 (June 16, 2017), Friedenberg Decl. Ex.

28   85, ECF No. 142-4 (noting previous abstentions).

1    The UAN 32 agreement came up again in board meetings the next year. *See* Calamco Bd.

2    Mtg. Mins. at 3 (Feb. 2–3, 2017), Friedenberg Decl. Ex. 109, ECF No. 142.4; Stone Decl. ¶ 14.

3    Calamco management ultimately recommended a further reduction in the patronage refund "to

4    match the revenue stream with the patronage payout on the product."   Calamco Bd. Mtg. Mins. at

5    2 (June 16, 2017).  The minutes do not record any further discussion about whether Calamco

6    would compete with Simplot.  *See id.*  The board approved that reduction, with the class B

7    directors again abstaining.  *See id.* at 2–3.

8    As noted above, Dan Stone became CEO in late 2018.  Stone Decl. ¶ 2.  He continued

9    looking for alternative sources of UAN 32, including by contacting one of Simplot's competitors.

10   *See* Email from Dan Stone to Jason Kubik (Sept. 27, 2019), Ivy Decl. Ex. W, ECF No. 148-1.

11   Calamco's board also again discussed "Calamco's potential entry into the UAN32 market" in

12   December 2019.  Calamco Bd. Mtg. Mins. at 3 (Dec. 13, 2019), Ivy Decl. Ex. V, ECF No. 148-1.

13   The board appeared to anticipate, however, that Calamco and Simplot would continue

14   collaborating.  The minutes report that one of the class B directors, Richard Sunderland, wanted

15   "to discuss options on how Calamco and J.R. Simplot Company can collaborate on a potential

16   partnership on the sales and marketing of UAN32."  *Id.* at 4.

17   Stone continued his efforts to find an alternative UAN 32 supplier among Simplot's

18   competitors in 2020.  It is unclear from the sparse evidence in the record whether he believed

19   Calamco could sell UAN 32 in competition with Simplot without first renegotiating their HSA.

20   In a February 2020 email, for example, Stone wrote that Koch Industries was "offering to sell out

21   of their Stockton tank . . . at a good price" that "would allow us to enter the market in low risk

22   way," and he attached a summary of a potential deal.  Email from Dan Stone to Bardin Bengard

23   (Feb. 4, 2020), Ivy Decl. Ex. AA, ECF No. 148-1.  The summary lists several benefits of a deal

24   with Koch, including "Increases leverage with Simplot on potential contract re-negotiation."  *Id.*

25   The minutes of a board meeting from this period are similarly unclear when it comes to

26   what Calamco's and Simplot's board members and management believed about the HSA.  A

27   specific project actually appears to have been on the table.  The minutes of a February 2020 board

28   meeting describe a discussion, led by Stone, "on the status of the potential UAN32 project."

1   Calamco Bd. Mtg. Mins. at 2 (Feb. 20, 2020), Ivy Decl. Ex. S, ECF No. 148-1.  He said Calamco

2   was seeking permits, had secured $5 million in financing, was working with vendors "on the

3   potential tank build," had received a "firm lease proposal from the Port of Stockton on additional

4   land."  *Id.* at 2.  He also made clear Calamco was continuing "to seek a potential partnership with

5   existing UAN32 vendors at the Port of Stockton."  *Id.*  Sunderland again said Simplot "would like

6   to partner with Calamco on this project."  *Id.*

7          The next month, Stone came to Sunderland with a proposal.  He asked whether Simplot

8   would agree to amend the HSA so Calamco could use the piping it was operating for Simplot for

9   other purposes.  *See* Sunderland Dep. at 42, 81, Ivy Decl. Ex. L, ECF No. 148-1.  Sunderland

10  agreed to the amendment as a way "to avoid an unnecessary capital outlay."  *Id.* at 42.  He

11  understood Stone intended to use the piping for UAN 32, but he emphatically denies he believed

12  Calamco could enter the market for UAN 32.  *See id.* at 42–43, 45, 81, 102–03.  In an email,

13  Stone described the meeting differently.  He said it was Simplot that had "decided to NOT pursue

14  a modification in the business model with Calamco."  Dan Stone Email to Case Van Steyn, et al.

15  (Mar. 12, 2020), Friedenberg Decl. Ex. 36, ECF No. 142-4 (emphasis in original).  Simplot had

16  instead "agreed to amend the storage and handling contract to allow Calamco to use the piping,

17  which saves Calamco roughly $0.5M in capital IF Calamco decides to construct a UAN tank."

18  *Id.* (emphasis in original).

19         Calamco and Simplot did in fact agree to the amendment in March 2020.  *See* Amend. to

20  Handling & Storage Agmt., Friedenberg Decl. Ex. 38, ECF No. 142-4.  It begins by stating in its

21  two recitals that the 2011 HSA remains in effect and that the amendment's purpose "is to allow

22  Calamco the use of inbound pipe which, under the [2011 HSA], is currently for the exclusive use

23  of Simplot."  *Id.*  The amendment then adds two sentences to the 2011 HSA.  First, it clarifies the

24  third recital of the 2011 HSA: "Nothing contained in this Recital C shall prohibit Calamco from

25  utilizing the inbound piping for its own purposes, so long as the use does not interfere with

26  Simplot's ability to obtain delivery of Product."  *Id.*  Second, the 2011 HSA prohibits the

27  commingling of UAN 32 "with similar materials belonging to any other party whatsoever."  *See*

28  *id.* (citing 2011 HSA § 1(a)).  The amendment clarifies that "[u]se by Calamco of the inbound

1    piping shall not be considered a violation" of that prohibition "or any other provision" of the 2011

2    HSA.  *See id.*  "In all other respects," the amendment concludes, the 2011 HSA "shall remain in

3    full force and effect."  *Id.*  The amendment does not mention UAN 32 and does not include any

4    provision expressly allowing Calamco to obtain UAN 32 from sources other than Simplot.

5           After this amendment was finalized, Stone obtained the board's approval to allocate $5.3

6    million to the construction of a "UAN 32 tank and associated equipment" and to lease an

7    additional 3.54 acres from the Port of Stockton.  *See* Calamco Special Competitive Mtg. Mins. at

8    1–2 (July 16, 2020), Ivy Decl. Ex. CC, ECF No. 148-1.  He made these plans public the next

9    month in an announcement to Calamco's shareholders that the cooperative would begin

10   marketing UAN 32 in 2021.  *See* Dan Stone Shareholders Letter (July 17, 2020), Ivy Decl. Ex.

11   DD, ECF No. 148-1.  Purchases of Calamco's UAN 32 would "earn full patronage."  *Id.*  By

12   contrast, purchases of "Simplot UAN32" would not.  *Id.*  The implication was clear: Calamco was

13   giving its shareholders an incentive to buy UAN 32 from the cooperative directly rather than from

14   Simplot.  *See* Stone Dep. at 206 (agreeing "the intent . . . was specifically to cause that result,

15   business to go from Simplot to Calamco" and testifying Calamco would "have a price advantage

16   that [it] didn't have before").

17          Attorneys representing Simplot wrote to Stone to express their belief that "Calamco's

18   pursuit of the UAN32 project, without approval or consent from Simplot, as well as Cal Ida and

19   the three Class B directors, would breach the express terms of the Handling and Storage

20   Agreement between Calamco and Simplot."  Letter from Steven Ducommun to Dan Stone at 2

21   (Aug. 14, 2020), Ivy Decl. Ex. FF, ECF No. 148-1.  Calamco then filed its complaint in this

22   action.  It asserts a single claim for declaratory relief, requesting "a court decree that the [2011

23   HSA], as Amended, does not restrain Calamco from selling, distributing or marketing UAN 32,

24   and that Calamco is entitled to sell UAN 32 in competition with Simplot."  Compl. ¶ 34, ECF

25   No. 1-3.

26   /////

27   /////

12

1    In response, Simplot asserts several counterclaims.  First, it seeks declaratory judgment in

2   the form of a three-part decree:

3              (i) that the parties' agreements preclude Calamco from acquiring and
4              selling UAN32 to its shareholders; (ii) that the parties' agreements
5              and Calamco's bylaws require payment of patronage dividends to
6              those Calamco shareholders who purchase Simplot UAN32 and all
7              prior actions by Calamco to eliminate patronage on Simplot UAN32
8              are void *ab initio*; and (iii) that the parties' agreements and
9              Calamco's bylaws entitle Simplot to Preferred Patronage on any sale
10             of an enhanced product to a Calamco shareholder and all prior
11             actions by Calamco to eliminate Simplot's Preferred Patronage Right
12             are void *ab initio*.

13   Am. Answer & Countercl. ¶ 175, ECF No. 80.  Second, it asserts a claim for breach of fiduciary

14   duties based on the allegation that Simplot and Calamco were partners in a joint venture, and it

15   alleges Calamco breached its duties of loyalty, candor and care.  *See id.* ¶¶ 177–78.  Third,

16   Simplot alleges Calamco breached the implied covenant of good faith and fair dealing.  *See id.*

17   ¶¶ 181–83.  And in its fourth and fifth counterclaims, it alleges Calamco breached its implied

18   contractual obligation "[b]y unilaterally terminating patronage dividends" and "[b]y unilaterally

19   terminating Simplot's preferred Patronage Rights," respectively.  *Id.* ¶¶ 186, 191.  These claims

20   all arise under California law.

21   Simplot withdrew its claims about preferred patronage rights during discovery.  *See* Resp.

22   Stmt. Fact No. 11, ECF No. 147-2.  Calamco now moves for summary judgment of the remaining

23   counterclaims.  *See generally* Mot., ECF No. 142.  The motion is fully briefed.  *See generally*

24   Opp'n, ECF No. 147; Reply, ECF No. 151.  The court heard oral arguments at a hearing on

25   July 7, 2025, at which Adam Friedenberg appeared for Calamco, and Scott Ivy and Shane Smith

26   appeared for Simplot.  Following argument, the court took the motion under submission.  Mins.,

27   ECF No. 160.

28   **II.    DISCUSSION**

29   Summary judgment is appropriate if "there is no genuine dispute as to any material fact

30   and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is

31   "genuine" if "a reasonable jury could return a verdict for the nonmoving party," Simplot in this

13

1    case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might

2    affect the outcome of the suit under the governing law."  *Id.*  The parties must cite "particular

3    parts of materials in the record."  Fed. R. Civ. P. 56(c)(1).  The court then views the record in the

4    light most favorable to the nonmoving party and draws reasonable inferences in that party's favor.

5    *Matsushita*, 475 U.S. at 587–88; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

6         Simplot's counterclaims fall into two categories.  Its first, third, and fourth

7    counterclaims—for declaratory relief, breach of the covenant of good faith and fair dealing, and

8    breach of an implied contract, respectively—rest on allegations about the parties' contracts and

9    contract obligations, whether written or implied.  The second counterclaim, by contrast, focuses

10   on an alleged joint venture and breaches of fiduciary duties.  The court begins with the contract

11   claims.

12        **A.    Written Contract and Declaratory Relief**

13        In Simplot's first counterclaim, it requests a declaration (1) that Calamco may not sell

14   UAN 32 directly to its shareholder patrons in competition with Simplot and (2) that Calamco

15   must pay patronage on Simplot UAN 32.  For ease of reference, the court refers to these parts of

16   Simplot's first counterclaim as the "exclusivity claim" and the "patronage claim," respectively.

17        The basic rules of contract interpretation in California are well known and are laid out in

18   the state's Civil Code.  When a dispute arises, courts must "give effect to the mutual intention of

19   the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful."

20   Cal. Civ. Code § 1636.  If the contract's language "is clear and explicit, and does not involve an

21   absurdity," then that language must "govern its interpretation."  *Id.* § 1638.  By default, "[t]he

22   words of a contract are to be understood in their ordinary and popular sense, rather than according

23   to their strict legal meaning," *id.* § 1644, and "[t]he whole of a contract is to be taken together, so

24   as to give effect to every part, if reasonably practicable, each clause helping to interpret the

25   other," *id.* § 1641.

26        In addition, when the parties have put their agreement in writing, the Civil Code provides

27   that "the intention of the parties is to be ascertained from the writing alone, if possible."  *Id.*

28   § 1639.  "The execution of a contract in writing" in fact "supersedes all the negotiations or

14

stipulations concerning its matter which preceded or accompanied the execution of the instrument." *Id.* § 1625.  And if the parties intend their contract to be "a final expression of their agreement with respect to the terms included therein," then those terms "may not be contradicted by evidence of a prior agreement or of a contemporaneous oral agreement."  Cal. Civ. Proc. Code § 1856(a).  This type of evidence is usually referred to as "parol" or "extrinsic" evidence, and the rule laid out in sections 1625 and 1856 is often cited as the "parol evidence rule."  *See, e.g.*, *Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Ass'n*, 55 Cal. 4th 1169, 1174 (2013) (citing Cal. Civ. Code § 1625 and Cal. Civ. Proc. Code § 1856).  That rule is a "substantive" aspect of California law, not a rule of evidence or procedure, *see id.*, and therefore federal courts follow it in diversity actions such as this one, *see, e.g.*, *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 989–90 (9th Cir. 2006) (per curiam), *adopting* 318 F. Supp. 2d 923 (C.D. Cal. 2004).

"Much has been written about how to interpret a writing, and whether parol evidence may be used to add to, explain or vary it."  *Abers v. Rounsavell*, 189 Cal. App. 4th 348, 356 (2010).  Even more has been written in the years since the Court of Appeal made this observation, including in cases before this court.  *See generally, e.g.*, *VFLA Eventco, LLC v. William Morris Endeavor Ent., LLC*, 100 Cal. App. 5th 287 (2024); *Epic Commc'ns, Inc. v. Richwave Tech., Inc.*, 237 Cal. App. 4th 1342 (2015); *Alameda Cnty. Flood Control & Water Cons. Dist. v. Dep't of Water Res.*, 213 Cal. App. 4th 1163 (2013); *see also, e.g.*, *Copart, Inc. v. Sparta Consulting, Inc.*, 339 F. Supp. 3d 959 (E.D. Cal. 2018); *Lennar Mare Island, LLC v. Steadfast Ins. Co.*, 176 F. Supp. 3d 949 (E.D. Cal. 2016).

For example, disputes have arisen about contracts with ambiguous terms—that is, when a particular word or phrase has more than one "alternative, semantically reasonable, candidate of meaning," and the parties disagree about which interpretation is the right one.  *Diamond v. Schweitzer*, 110 Cal. App. 5th 866, 332 (2025) (quoting *Benedek v. PLC Santa Monica*, 104 Cal. App. 4th 1351, 1357 (2002)); *see also, e.g.*, *Epic*, 237 Cal. App. 4th at 1348–54 (finding contract ambiguous on its face).  Sometimes the words in the contract do not appear to be ambiguous, but one of the parties argues some other document, a witness's testimony or another type of evidence

1    reveals a hidden or "latent" ambiguity. *See, e.g.*, *Wolf v. Walt Disney Pictures & Television*,

2    162 Cal. App. 4th 1107, 1133–34 (2008). And sometimes the parties have long behaved as

3    though their contract meant something other than what it seems to say. *See, e.g.*, *Epic*,

4    237 Cal. App. 4th at 1355 (discussing evidence about "course of performance"); *Emps.*

5    *Reinsurance Co. v. Superior Ct.*, 161 Cal. App. 4th 906, 920–26 (2008) (same).

6         Against this backdrop, what role does extrinsic evidence play in each of these situations?

7    In some cases, it can be difficult to reconcile the various statutes, committee reports, opinions,

8    treatises and other authorities. *See, e.g.*, *Lennar*, 176 F. Supp. 3d at 964–67 (summarizing one

9    apparent conflict in opinions of California's intermediate appellate courts). In this case, there is

10   no need to reconcile any conflicting authorities. The relevant legal principles are clear, and under

11   those principles, Simplot could potentially prove its exclusivity claim at trial, but not its

12   patronage claim, as explained below.

13        In the first place, there is no question but that this is a case about an integrated agreement,

14   i.e., a written contract that is the "complete and final expression of the parties' agreement." *Batta*

15   *v. Hunt*, 106 Cal. App. 5th 295, 308 (2024) (quoting *Hayter Trucking, Inc. v. Shell Western E&P,*

16   *Inc.*, 18 Cal. App. 4th 1, 14–15 (1993)). Both the 2001 and 2011 handling and storage

17   agreements state expressly and unambiguously that they "contain the entire understanding"

18   between Calamco and Simplot and supersede "any prior written or oral agreements" they might

19   have made. *See* 2001 HSA § 20; 2011 HSA § 20.

20        The "first question" to answer in a case about an integrated agreement is whether it is

21   "reasonably susceptible" to competing interpretations. *Dore v. Arnold Worldwide, Inc.*, 39 Cal.

22   4th 384, 393 (2006) (quoting *S. Cal. Edison Co. v. Superior Court*, 37 Cal. App. 4th 839, 847

23   (1995)). A party can rely on both "the language of the contract itself" and on "extrinsic evidence

24   of the parties' intent" to show the disputed agreement is reasonably susceptible to a proposed

25   interpretation. *S. Cal. Edison*, 37 Cal. App. 4th at 848 (citing *United Teachers of Oakland v.*

26   *Oakland Unified Sch. Dist.*, 75 Cal. App. 3d 322, 330 (1977) and *Winet v. Price*, 4 Cal. App. 4th

27   1159, 1165 (1992)). Even if the disputed contract seems clear, "a latent ambiguity may be

28   exposed by extrinsic evidence which reveals more than one possible meaning to which the

1  language of the contract is yet reasonably susceptible." *Dore*, 39 Cal. 4th at 391 (quoting *Morey*

2  *v. Vannucci*, 64 Cal. App. 4th 904, 912 (1998)).

3        If the agreement is not reasonably susceptible to competing interpretations, then "the case

4  is over." *Id.* at 393 (quoting *S. Cal. Edison*, 37 Cal. App. 4th at 847). The contract means what it

5  says. *See id.* But if the agreement is reasonably susceptible to competing interpretations, then the

6  court "moves to the second question: what did the parties intend the language to mean?" *Epic*,

7  237 Cal. App. 4th at 1354 (quoting *Hartzheim v. Valley Land & Cattle Co.*, 153 Cal. Ap. 4th 383,

8  389–90 (2007)). Contract interpretation is a question of law, so if there is no "material conflict"

9  in the relevant evidence, then there is no need for a trial. *See Wolf*, 162 Cal. App. 4th at 1126–27.

10  "This is true even when conflicting inferences may be drawn from the undisputed extrinsic

11  evidence or that extrinsic evidence renders the contract terms susceptible to more than one

12  reasonable interpretation." *Id.* (citation and footnote omitted). But if the extrinsic evidence does

13  conflict—for instance, because witnesses would disagree and their credibility must be assessed—

14  and if there are multiple "plausible interpretations of the language" as a result of this conflict,

15  then summary judgment cannot be granted. *WYDA Assocs. v. Merner*, 42 Cal. App. 4th 1702,

16  1710 (1996). A jury must resolve the factual conflict. *See Wolf*, 162 Cal. App. 4th at 1127; *see*

17  *also San Diego Gas & Elec. Co. v. Canadian Hunter Mktg. Ltd.*, 132 F.3d 1303, 1307 (9th Cir.

18  1997) (applying Federal Rule of Civil Procedure 56 in this context).

19        When California appellate courts have written about this two-step process, they have often

20  underscored an important ground rule: a litigant cannot use extrinsic evidence to remove an

21  unfavorable provision from a contract, nor to add a new term. *See Alameda Cnty. Flood Control*,

22  213 Cal. App. 4th at 1190 (collecting authority). Extrinsic evidence can help to explain what a

23  contract means, but it cannot "vary, alter or add to the terms of an integrated written instrument."

24  *Casa Herrera, Inc. v. Beydoun*, 32 Cal. 4th 336, 343 (2004) (quoting *Alling v. Universal Mfg.*

25  *Corp.* 5 Cal. App. 4th 1412, 1433 (1992)). For example, in one recent case, an aviation company

26  had agreed to lease a property within a municipal airport, and the lease had an integration clause.

27  *See Coyote Aviation Corp. v. City of Redlands*, 111 Cal. App. 5th 955, 2025 WL 1587299, at *1

28  (Cal. Ct. App. June 5, 2025). The aviation company could have extended the lease's twenty-year

17

1    term by giving written notice at least forty-five days before the termination date. *Id.* at *11. But

2    it did not give written notice by the deadline, so the city terminated the lease. *See id.* at *2–10. In

3    the ensuing litigation, the company argued among other things that the parties had actually

4    believed the termination date was later, and it argued an informal request to extend the lease

5    sufficed. *See id.* at *10. The Court of Appeal summarily rejected these arguments. The company

6    was not offering evidence about "what the written agreement stated." *Id.* at *11. It was simply

7    attempting "to alter the terms of the integrated agreement." *Id.* "This is not a proper use of parol

8    evidence." *Id.*

9           This same ground rule also has proven decisive when a litigant has not tied its evidence to

10   a specific word or phrase within the contract. It is "*essential* to tether extrinsic evidence to

11   particular language." *Alameda Cnty. Flood Control*, 213 Cal. App. 4th at 1188 (emphasis in

12   original). "There cannot be an ambiguity per se, i.e., an ambiguity unrelated to an application."

13   *Dore*, 39 Cal. 4th, at 391 (quoting *Cal. State Auto Ass'n Inter Ins. Bureau v. Superior Court*,

14   2 Cal. 3d 192, 199 n.4 (1970)). Contracts cannot be "ambiguous in the abstract." *Bay Cities*

15   *Paving & Grading, Inc. v. Lawyer's Mut. Ins. Co.*, 5 Cal. 4th 854, 867 (1993) (emphasis omitted)

16   (quoting *Bank of the W. v. Superior Court*, 2 Cal. 4th 1254, 1265 (1992)). The question is not

17   whether a contract "appears to the court to be plain or unambiguous on its face, but whether the

18   offered evidence is relevant to prove a meaning to which the language of the instrument is

19   reasonably susceptible." *Alameda Cnty. Flood Control*, 213 Cal. App. 4th at 1189 (emphasis

20   omitted) (quoting *Dore*, 39 Cal. 4th at 391). For these reasons, when a litigant offers extrinsic

21   evidence, the court expects that litigant "to identify which portions of the *contractual language*

22   were rendered ambiguous by which pieces of intrinsic evidence." *Id.* at 1190 (emphasis in

23   original).

24          This tethering requirement was crucial in *Lennar Mare Island*, cited above, a case before

25   this court, which Calamco now cites. *See* Reply at 1. The parties in *Lennar* disagreed about how

26   to interpret the phrase "known pollution condition," which their contract used more than a

27   thousand words to define. *See* 176 F. Supp. 3d at 957–58. One of the parties argued "known

28   pollution condition" meant quite simply that the "condition" was "known" to the parties. *See id.*

at 957.  It presented a large collection of extrinsic evidence in an effort to prove that was what the parties had long understood.  *See id.* at 969–70.  But it did not explain how most of that evidence could explain any of the words or phrases in the thousand-word definition.  *See id.* at 971.  Its position amounted to an assertion the definition was irrelevant.  *See id.*  For that reason, this court declined to consider most of its extrinsic evidence.  *See id.*  But the court did consider the evidence that party offered about a specific reference to unnamed "additional sites."  *See id.* at 971–72.

Bringing these rules together as applicable here, it is Simplot's burden to show the parties' handling and storage agreement is reasonably susceptible to the meanings it advocates in its exclusivity and patronage claims.  *See Dore*, 39 Cal. 4th at 391, 393.  In response to Calamco's summary judgment motion, then, Simplot must cite specific portions of the record to show the handling and storage agreement or another agreement is reasonably susceptible of these interpretations.  *See* Fed. R. Civ. P. 56(c); *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  Simplot can rely on both the language of the agreement itself and extrinsic evidence.  *S. Cal. Edison*, 37 Cal. App. 4th at 848.  But it must tie that extrinsic evidence to an anchor within the contract itself, and it cannot use extrinsic evidence to add new terms to the agreement.  *See Alameda Cnty. Flood Control*, 213 Cal. App. 4th at 1189–90.

The anchor for Simplot's exclusivity claim is in the first recital of the 2011 HSA.  To review, that recital explains how Calamco and Simplot had previously "partnered together to address concerns over the potential declines in the application of ammonia within California agriculture."  2011 HSA at 1.  "In order to maintain Calamco's ability to supply its membership with nitrogen fertilizer," the recital then continues, "Simplot and Calamco reached agreement for Simplot to bring off-shore fertilizer UAN 32 solutions . . . to the Western U.S. market, with Calamco providing to Simplot the off-loading and storage facilities, together with handling activities to accommodate such Product."  *Id.*  In conclusion, the recital states that Simplot and Calamco "wish for this arrangement to continue."  *Id.*

This language may very well be ambiguous on its face.  It describes how Calamco and Simplot previously partnered together to "maintain Calamco's ability to supply its membership"

19

1  with UAN 32, without qualification.  Specifically, they agreed Simplot would import the UAN

2  32—not that Calamco would import it, not that Calamco would manufacture it, not that Calamco

3  would buy it from some other source.  And then they wrote that their purposes in signing the 2011

4  agreement included their "wish for this arrangement to continue."  In any event, however, even if

5  the recital is not ambiguous on its face, Simplot might be able ultimately to prevail by offering

6  extrinsic evidence to reveal a latent ambiguity within the recital.  In short, Simplot has identified

7  this language as an anchor to which it may tie extrinsic evidence about the parties' intentions.

8  Calamco's arguments to the contrary are cursory, unreasoned and unpersuasive.  *See* Mot. at 10

9  (asserting "Simplot has never identified any ambiguous language."); Reply at 1 (acknowledging

10  Simplot's reference to the first recital but asserting no ambiguity).

11       Simplot cites both the language of the 2011 HSA and extrinsic evidence in support of its

12  proposed interpretation.  *See* Opp'n at 12–14.  In the contract itself, Simplot cites its obligation to

13  move 100,000 short tons of UAN32 through the facility each year on a take or pay basis.  *Id.*

14  (citing 2011 HSA at 1, 4).  Simplot argues that if Calamco could compete with it for its

15  shareholders' business, then Calamco could prevent Simplot from moving all 100,000 short tons

16  through the facility.  *See id.*  Simplot similarly cites Calamco's obligation to operate the facilities

17  for Simplot's exclusive benefit.  *See id.* at 13.  "If Calamco was allowed . . . to sell UAN32

18  directly to its shareholders," Simplot argues, "and thereby frustrate Simplot's ability to meet the

19  contractual thresholds, the promise of exclusive use of the facilities would be illusory."  *Id.*

20  Simplot also emphasizes its obligation to use "'reasonable good faith efforts' to supply Calamco

21  shareholders with all the UAN32 they require."  *Id.* at 12–13 (quoting 2011 HSA at 1).  As

22  Simplot reads it, this obligation implies "that Simplot (not Calamco) would be the one to have the

23  exclusive right to sell UAN32 to Calamco shareholders."  *Id.*

24       In addition to this contract language, Simplot cites the history of the parties' negotiations,

25  discussed above, in addition to their longstanding exclusive relationship.  It refers first to "[t]he

26  fact that Simplot (not Calamco) has supplied UAN32 to Calamco shareholders in the 24 years the

27  2001 HSA and 2011 HSA have been in force."  *Id.* at 13.  It next cites the deposition testimony of

28  those who negotiated the original and amended handling and storage agreements, summarized in

1   the background section above. *See id.* at 13–14. Finally, it cites one of Calamco's own annual

2   reports, which describes the UAN32 in the facilities as "procured and marketed exclusively by

3   Simplot." *Id.* at 13 (quoting Ivy Decl. Ex. MM at 5, ECF No. 148-2).

4         If a factfinder credits this evidence, it could prove Simplot and Calamco believed they

5   were entering a mutually exclusive agreement in 2001 and believed they were continuing that

6   agreement in 2011. Of course, it may well be the parties' course of dealing is not as exclusive as

7   Simplot contends. For example, Simplot repeatedly failed to object after Calamco's management

8   proposed acquisitions of UAN 32 processing facilities. And as Calamco points out, there may

9   also be factual conflicts and credibility problems Simplot will have to confront. *See, e.g.*, Reply

10  at 2 (arguing a Simplot witness cannot offer reliable testimony about the parties' negotiations).

11        But to be clear, the court need not and does not now decide which party's interpretation of

12  this evidence is correct as a matter of law. Nor can the court decide on the record before it which

13  specific conflicts in the evidence are material, if any, nor which conflicts necessitate a trial rather

14  than interpretation by the court as a matter of law. *See Wolf*, 162 Cal. App. 4th at 1126–27.

15  Calamco has not asked the court to engage in such an effort; it contends the evidence is irrelevant

16  and the agreement unambiguously favors its position. Nor has Simplot asked the court to

17  interpret the contract as a matter of law; it asks the court only to deny Calamco's motion because

18  it believes genuine disputes of material fact remain to be resolved at trial. For the reasons

19  provided here, the court denies Calamco's motion for summary judgment with respect to

20  Simplot's exclusivity claim and goes no further.

21        In contrast, Simplot has cited no potentially ambiguous contract language that could

22  support its patronage claim. It refers again to the first recital, *see* Opp'n at 16, but that recital

23  does not mention patronage or any other incentives to Calamco shareholders. Simplot argues the

24  recital implies Calamco would pay patronage to give its shareholders an incentive "to purchase

25  the product from Simplot as opposed to other sources." *Id.* It may have been wise for Calamco

26  to pay patronage. If it did not, and if Calamco may not itself supply its shareholders with UAN

27  32 directly, then both Simplot and Calamco might lose out on those shareholders' business if they

28  went looking for another supplier. But Simplot cites no authority equating financial incentives

1  with contractual obligations in any similar legal context, and the court is aware of none.  Because

2  Simplot has not pointed to any potentially ambiguous contract language, its evidence about the

3  parties' unwritten expectations is "irrelevant."  *Riverisland*, 55 Cal. 4th at 1174 (emphasis

4  omitted).  Calamco's motion for summary judgment of Simplot's patronage claim is granted.

5  Because the court grants the motion for this reason, it does not reach the question whether the

6  patronage claim is time-barred, nor whether Calamco's bylaws required or permitted patronage

7  dividends on Simplot UAN 32 purchases.  *See* Mot. at 11–12.

8          **B.      Good Faith and Fair Dealing**

9          Simplot alleges in its third counterclaim that Calamco breached the implied covenant of

10  good faith and fair dealing.  This implied covenant prevents "a contracting party from engaging in

11  conduct that frustrates the other party's rights to the benefits of the agreement."  *Waller v. Truck*

12  *Ins. Exch., Inc.*, 11 Cal. 4th 1, 36 (1995).  It does not "impose substantive terms and conditions

13  beyond those to which the contract parties actually agreed."  *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th

14  317, 349–50 (2000).

15          Simplot does not develop the theory of its third counterclaim clearly in its pleading.  *See*

16  Am. Countercl. ¶¶ 180–83.  But in opposition to Calamco's motion, Simplot explains this claim

17  focuses on Calamco's decision to reduce and eventually stop paying patronage to the shareholders

18  who bought UAN 32 from Simplot.  *See* Opp'n at 19–20.  It argues this decision "was specifically

19  intended to allow Calamco to more easily cannibalize sales that would otherwise have gone to

20  Simplot and to harm Simplot's ability to meet its obligation and receive the benefits under the

21  HSA."  *Id.* at 20.  These arguments parallel other allegations in Simplot's pleadings, which it

22  incorporated by reference in the relevant section of its pleading.  *See* Am. Countercl. ¶¶ 125–30,

23  150–59.

24          Calamco argues Simplot's theory contradicts the basic principle, summarized above, that

25  the covenant of good faith and fair dealing "neither alters specific obligations set forth in the

26  contract nor adds duties independent of the contractual relationship."  Reply at 9 (quoting

27  *McKnight v. Torres*, 563 F.3d 890, 893 (9th Cir. 2009)).  This argument misconstrues Simplot's

28  claim.  Simplot does not contend in its third counterclaim that Calamco had an obligation to pay

1  patronage dividends; it contends Calamco's actions prevented Simplot from fulfilling its

2  obligation to put 100,000 short tons of UAN 32 through the terminal.  It is undisputed Calamco

3  reduced and eliminated the patronage payments because it wanted to give its shareholders an

4  incentive to shift their business from Simplot to Calamco.  *See* Stone Dep. at 206.  If Calamco

5  persuaded its shareholders not to purchase UAN 32 from Simplot, then Simplot may very well

6  fall short of its obligation to take 100,000 short tons of UAN from the terminal, and if it did, it

7  would still be obligated to pay the same storage and handling fees, as it promised in the HSA.

8  *See* 2011 HSA § 9.  Additionally, Simplot would lose out on any profits it would make selling its

9  UAN 32 to Calamco shareholders.  Calamco has not carried its initial burden on summary

10  judgment in this respect.  *See Nissan Fire*, 210 F.3d at 1102–03.

11        Calamco also argues for the first time in reply that Simplot cannot prove it suffered any

12  damages as a result of Calamco's actions.  *See* Reply at 9.  It is true Simplot ultimately would

13  bear the burden at trial to prove Calamco's actions have proximately caused it to suffer harm.

14  *See, e.g.*, Judicial Council of Cal. Civ. Jury Instr. No. 325 (2024); *see also, e.g.*, *Bennett v. Ohio

15  Nat'l Life Assurance Corp.*, 92 Cal. App. 5th 723, 729 (2023), *review denied* (Cal. Oct. 11, 2023)

16  ("Both breach of contract and breach of the implied covenant of good faith and fair dealing, i.e.,

17  bad faith, include a damages element."); *Vu v. California Com. Club, Inc.*, 58 Cal. App. 4th 229,

18  233 (1997) (discussing proximate cause requirement).  But because Calamco raised this argument

19  for the first time in reply, Simplot could not respond to it.  The amount of any damages also

20  appears to be the subject of conflicting expert testimony.  *Cf., e.g.*, Resp. Stmt. Facts No. 18, ECF

21  No. 147-2 ("The parties have exchanged expert discovery on whether Calamco's elimination of

22  patronage damaged Simplot, and in what amount.").  This court "need not consider arguments

23  raised for the first time in a reply brief" and declines to do so now.  *Zamani v. Carnes*, 491 F.3d

24  990, 997 (9th Cir. 2007).  The court denies Calamco's motion for summary judgment of this

25  counterclaim.

26        **C.    Implied Contract**

27        Simplot alleges in its fourth counterclaim that Calamco's actions breached the terms of an

28  implied contract.  *See* Am. Countercl. ¶¶ 184–88.  Calamco argues persuasively in its motion that

23

1    Simplot's implied contract claim cannot move forward to trial alongside its express contract claim

2    because " an action based on an implied-in-fact or quasi-contract cannot lie where there exists

3    between the parties a valid express contract covering the same subject matter." Mot. at 18

4    (quoting *Lance Camper Mfg. Corp. v. Repub. Indemnity Co.*, 44 Cal.App.4th 194, 203 (1996));

5    *see also* Reply at 10 (same). Simplot does not argue otherwise in opposition. It has not offered

6    evidence that could show the written HSA relates to a different subject matter or is invalid.

7        At hearing, Simplot argued its implied contract claim is an alternative claim that it may

8    pursue in parallel with its claim for declaratory relief based on an express contract. In response to

9    the court's question, however, Simplot could not identify any case in which a court allowed both

10    express and implied contract claims to be presented in parallel, when the two claims asserted

11    essentially the same agreement, as is true in this case. Moreover, as Calamco argues persuasively

12    in its reply, the parties' 2010 Business Alliance and Cooperative Governance Agreement

13    "terminated and replaced" all contracts between Calamco and Simplot except for those listed in

14    an exhibit. BACGA § 1. No implied or other agreement like the one Simplot now proposes is

15    listed in that exhibit. *See* BACGA Ex. 1. The court grants the motion for summary judgment of

16    Simplot's fourth counterclaim.

17        **D.    Fiduciary Duties**

18        Simplot alleges in addition to its contract claims that Calamco breached two fiduciary

19    duties. *See* Am. Countercl. ¶¶ 177–78. First, it contends Calamco breached its duty of loyalty by

20    "eliminating patronage on Simplot UAN32 not based on any legitimate market factors or good

21    faith interpretation of the Bylaws, but to allow Calamco to divert sales from Simplot." Opp'n at

22    18. Second, Simplot argues Calamco breached its duty of confidence by "using confidential

23    information regarding Simplot's suppliers and UAN32 solicit Simplot's competitors to provide

24    UAN32 to Calamco in direct competition with Simplot." *Id.*

25        Simplot would not be able to prove any breaches of fiduciary duties at trial without first

26    establishing the two entities were in the type of commercial relationship that imposes fiduciary

27    obligations, such as a joint venture. *See* Mot. at 12–13; Opp'n at 17–18; *see also City of Hope*

28    *Nat'l Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 386 (2008); *Wolf v. Superior Ct.*, 107 Cal.

1    App. 4th 25, 30 (2003). "A joint venture is an undertaking by two or more persons jointly to

2    carry out a single business enterprise for profit." *Apr. Enters., Inc. v. KTTV*, 147 Cal. App. 3d

3    805, 819 (1983) (alteration omitted) (quoting *Nelson v. Abraham*, 29 Cal. 2d 745, 749 (1947)). A

4    relationship is a joint venture when three things are true: (1) the parties have a "joint interest in a

5    common business, (2) they will "share profits and losses" the business generates, and (3) they

6    have "a right to joint control" of the business. *Id.* A joint venture can be created expressly by

7    contract, but it can also "be assumed as a reasonable deduction from the acts and declarations of

8    the parties," if those acts and deductions demonstrate a joint venture was their intent. *Id.* (quoting

9    *Nelson*, 29 Cal. 2d at 749–50).

10          The court assumes for purposes of Calamco's motion that Simplot could prove the parties

11    had a joint interest in a common business, i.e., importing, selling, and distributing UAN 32

12    through the Port of Stockton. The court assumes similarly that Simplot could prove it jointly

13    controlled that business with Calamco. Even with the benefit of those assumptions, Simplot has

14    not shown it could prove Calamco and Simplot understood they would share profits and losses in

15    such a business. No evidence could show, for example, that if Simplot's costs in procuring and

16    transporting UAN 32 rose beyond the revenue it earned when it sold that UAN 32, then Calamco

17    would share the burden of that loss. Nor has Simplot cited any evidence to show Calamco

18    expected a share of any profits Simplot earned if procurement and transportation costs were low

19    while revenues were high. The record falls similarly short of connecting Calamco's and

20    Simplot's successes and failures more generally. If Simplot had an unexpectedly good month—

21    if, for example, an alternative product were suddenly and temporarily unavailable, driving

22    demand for Simplot's UAN 32 temporarily through the roof, such that California growers were

23    willing to pay Simplot twice or three times as much for the ship or trainload it had arranged to

24    import that month—nothing suggests Calamco's fortunes would rise in tandem. Calamco would

25    earn the handling and storage fees as usual. Simplot has cited nothing to suggest Calamco could

26    demand a share of Simplot's windfall. Nor does Simplot offer any reason to believe Calamco

27    would have any obligation to help shoulder any losses if, rather than a windfall, Calamco could

28    not sell its UAN 32 at profitable prices.

Simplot's arguments to the contrary rely primarily on "the parties' course of performance" and the patronage payments. *See* Opp'n at 17. For shared profits, Simplot points to "Calamco's 20-year history of paying patronage refunds as an incentive for its shareholders to purchase UAN32 supplied by Simplot," which would in turn drive up "sales and fees paid to Calamco." *Id.* More concretely, Simplot contends that if Calamco pays patronage on Simplot UAN 32, then Calamco shareholders effectively receive a discount on Simplot UAN 32, and they buy more UAN 32 from Simplot, assuming all else is equal. If Simplot brought more UAN 32 through Calamco's tanks and other facilities, then Simplot would pay more handling and storage fees to Calamco under the HSA. For shared losses, Simplot cites the same handling and storage fees. It argues it "agreed to share in Calamco's costs of handling UAN32 for the benefit of its shareholders and Simplot's customers." *Id.*

As the court probed with the parties at hearing, Simplot's theory of shared profits and losses seeks to prove too much. That theory implies almost any purchase and sale amount to an agreement to share profits and losses. By Simplot's reasoning, a buyer would "share" in a seller's "losses" any time the seller increased its prices to cover its own costs. As Calamco argues in reply, "that is not evidence of a joint venture, but rather a commercial arrangement." Reply at 8. Calamco provides a service (handling and storage), and Simplot pays a fee. *See id.* In addition, because Simplot relies on the same handling and storage fees to show Calamco benefits from greater UAN 32 volumes, its theory relies on the same evidence to prove both shared losses and shared profits. Simplot cites no case in which any court has accepted a similarly broad understanding of shared profits and losses, and the court's own searches have yielded none. The court grants Calamco's motion for summary judgment of this counterclaim.

### III. CONCLUSION

The motion for summary judgment is **granted in part and denied in part**:

- The motion is denied in part with respect to Simplot's first counterclaim for declaratory relief, inasmuch as it contends the 2011 HSA bars Calamco from selling UAN 32 to its shareholders in competition with Simplot. The motion is otherwise granted with respect to the first counterclaim.

- The motion is granted with respect to Simplot's second counterclaim for breach of fiduciary duties.
- The motion is denied with respect to Simplot's third counterclaim for breach of the implied covenant of good faith and fair dealing.
- The motion is granted with respect to Simplot's fourth counterclaim for breach of implied contract.
- The fifth counterclaim is dismissed as withdrawn.

A final pretrial conference is **set for September 25, 2025** at 10:00 AM in Courtroom Three at 501 I Street, Sacramento, California, 95814. The parties shall meet and confer and file a joint pretrial statement no less than 14 days prior to the final pretrial conference. The provisions of Local Rule 281 shall apply with respect to the matters to be included in the joint pretrial statement. At least one of the attorneys who will conduct the trial for each of the parties shall attend the final pretrial conference. All motions in limine must be filed in conjunction with the joint pretrial statement. In most cases, motions in limine are addressed and resolved on the morning of the first day of trial. The parties may alert the court at the final pretrial conference and in their final joint pretrial statement that a particular motion or motions should be resolved earlier. At the final pretrial conference, the court will set a briefing and hearing schedule on the motions in limine as necessary. The parties are reminded that a motion in limine is a pretrial procedural device designed to address the admissibility of evidence. The court looks with disfavor upon dispositional motions presented at the final pretrial conference or at trial in the guise of motions in limine.

This order resolves ECF No. 142.

IT IS SO ORDERED.

DATED: July 21, 2025.

_____
SENIOR UNITED STATES DISTRICT JUDGE